401 F.2d 128
 FLAMBEAU PLASTICS CORPORATION, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, and Local No.
380, International Union, Allied Industrial
Workers of America, AFL-CIO, Intervenor.
 No. 16560.
 United States Court of Appeals Seventh Circuit.
 Aug. 2, 1968, Certiorari Denied Jan. 13, 1969, See 89 S.Ct.
625.
 
 Walter S. Davis, Russ R. Mueller, Milwaukee, Wis., for petitioner.
 Kenneth R. Loebel, Richard M. Goldberg, Milwaukee, Wis., Goldberg, Previant & Uelmen, Milwaukee, Wis., for intervenor.
 Marcel Mallet-Prevost, Asst. Gen. Counsel, Nancy S. Sherman, Atty., N.L.R.B., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Leon M. Kestenbaum, Atty., N.L.R.B., Washington, D.C., for respondent.
 Before CASTLE, Chief Judge, and HASTINGS, and SWYGERT, Circuit Judges.
 SWYGERT, Circuit Judge.
 
 
 1
 Flambeau Plastics Corporation, located in Baraboo, Wisconsin, is engaged in the manufacture of plastic products. It petitions for review of an order of the National Labor Relations Board issued on October 12, 1967.[1] The Board, in turn, requests enforcement of its order. The affected labor organization, Local No. 380, International Union, Allied Industrial Workers of America, AFL-CIO, was permitted to intervene in this court.[2]
 
 
 2
 The Board found that Flambeau Plastics violated section 8(a)(5) of the National Labor Relations Act, 29 U.S.C. 158(a)(5), by issuing an employee handbook which had the effect of undermining the union; by refusing to bargain with the union in good faith with respect to the institution of a progressive training program; by failing to bargain in good faith during negotiations for a new contract; by withdrawing recognition and refusing to bargain with the union after September 15, 1966; and by accelerating the reclassification of nonstriking employees with the result that those employees received wage increases not offered to the union. The Board also found that Flambeau Plastics violated section 8(a)(3) of the Act, 29 U.S.C. 158(a)(3), by discriminatorily denying to employees who were on strike vacation benefits to which they were otherwise entitled. Finally, the Board found that the company violated section 8(a)(1) of the Act, 29 U.S.C. 158(a)(1), by assisting employees to resign from the union; by engaging in surveillance of union activities through photographing strikers on the picket line; and by interfering with union activities through company statements to employees.[3]
 
 
 3
 The Board ordered Flambeau Plastics to cease and desist from both engaging in the unfair labor practices enumerated above and interfering in any other manner with the employees' rights guaranteed by section 7 of the Act. Affirmatively, the Board ordered the company to reimburse the striking employees for any loss of vacation pay suffered because of any discrimination against them; to offer reinstatement, upon request, to striking employees to their former or substantially equivalent positions; to extend to the striking employees upon reinstatement the benefits of accelerated reclassification granted during the strike to nonstriking employees; and to bargain collectively with the union upon request.
 
 
 4
 Two principal questions are presented in this review: (1) whether the record supports the company's contention that the trial examiner was biased against it; and (2) whether substantial evidence on the record as a whole supports the Board's findings that Flambeau Plastics committed a variety of violations of the National Labor Relations Act.
 
 BACKGROUND
 
 5
 Events prior to those giving rise to the present proceeding are helpful in considering the numerous unfair labor practices found by the Board.
 
 
 6
 In March 1963 the union was certified as the collective bargaining agent of the company's production, maintenance, shipping, and warehouse employees. Contract negotiations began shortly thereafter. Eleven months after the start of negotiations, the union filed unfair labor practice charges against the company. The Board, adopting the trial examiner's decision,[4] found that the company had violated sections 8(a)(1), 8(a)(3), and 8(a)(5) of the Act by respectively imposing an over-broad nosolicitation rule, by both issuing a notalking order and discriminatorily laying off a union adherent, and by not bargaining in good faith.[5] After the issuance of the Board's order on March 12, 1965, the parties resumed their bargaining, and on May 17, 1965, a one-year agreement, renewable from year to year, was executed.
 
 FACTS
 
 7
 (a)
 
 
 8
 While the contract was in effect, the company in October 1965 issued an employees' handbook. The 1965 handbook was a revised edition of an earlier handbook which had been issued in 1960 and reprinted in 1963. The handbook, entitled 'This is Your Company,' contained a statement of the company's policy toward its employees, including what was expected of them, their work conditions, and the benefits to which they were entitled. The 1960 edition had outlined a grievance procedure which provided for an informal discussion with the foreman, then writing to the head of the department, and, finally, appealing to the president of the company. The 1963 edition had contained substantially the same information.
 
 
 9
 The 1965 revised edition, however, made no mention of a grievance procedure except to suggest to the employees that they should discuss any job problems with their foreman. The 1965 edition also suggested that in the event of an employee's discharge or layoff, the foreman would advise him as to the reason for such action, and if unsatisfied, the employee might bring his complaint to the attention of the director of manufacturing or some other company official. The handbook omitted any reference to the grievance procedure stipulated in the union contract which provided for union representation in grievance matters in a three-stage procedure: first, an employee would present the grievance to the employee's foreman, 'with or without the presence of a Union Stewart, as the employee may elect'; second, if the grievance were not settled, a union committee would present the grievance to a department director; and third, if the grievance remained unsettled, a union committee plus an International union representative would prosecute the matter before the company president. Although in the 'Forward' the company stated, 'This booklet contains revisions of former editions, bringing it into accord with an (union) agreement,'[6] the handbook omitted any reference to many other terms in the contract relating to the employees' working conditions.[7]
 
 
 10
 (b)
 
 
 11
 On April 1, 1966 the union notified the company that it desired to negotiate a new contract effective upon the expiration of the then existing contract in May. A series of bargaining sessions between the union and the company took place thereafter, including one on April 26. On or about that date, the company, without informing the union, filed a petition for unit clarification with the Board in connection with a 'progressive training program' being planned by the company.[8]
 
 
 12
 Bargaining sessions continued after April 26, but these resulted in no significant progress. The company would accede to none of the union's proposals which included provision for union security and dues checkoff, sick pay, bereavement pay, insurance, a grievance procedure, a no-strike clause, automatic progression, and a 24-cent an hour wage increase. Although the employees, pursuant to a Wisconsin statute, had voted in a referendum (113 to 21) in favor of a union shop, the company refused to agree to a union security clause because it 'always believed in the principle of free choice insofar as union membership is concerned.' To the proposal for a voluntary dues check-off made by the union, the vice-president of the company told the union representatives that 'inasmuch as the union had no share in collecting * * * accounts for the company,' the management 'saw no reason why the company should have to become bill collectors for the union.'
 
 
 13
 On May 9 the company submitted a counterproposal to the union, offering a four per cent wage increase and certain modifications of the old contract provisions respecting vacations, holidays, jury duty, and the probationary period. On June 5 the union members met and voted both to reject the company's counterproposal and to strike. They also voted to leave to the bargaining committee the decision when to call the strike.
 
 
 14
 On June 15 the employees struck. Two days later the company instituted the four per cent wage increase proposal which it had previously offered the union, retroactive to the day of the strike. Thereafter a mediator of the Federal Mediation and Conciliation Service met with the parties on several occasions; however, he could not effect a settlement of the strike. During this period, the union modified its wage demand from 24 cents per hour to 16 cents per hour and reduced its request for sick leave by one-half, although holding fast to its other demands. The mediator was told by the company that 'these monetary issues meant nothing to the company and that as long as a union shop, even a modified union shop was in the picture,' the company would not alter its position. The last session with the mediator occurred on August 23. On September 15, 1966 the company wrote the union that it had concluded the union no longer represented a majority of the employees and consequently that it would no longer continue to bargain with the union.
 
 
 15
 (c)
 
 
 16
 Within two weeks after the strike began, a total of fifteen Flambeau Plastic employees resigned from the union. Each signed a letter of resignation (identical in language) which had been written for the employees by the company. The postage was paid by the company. The company also did the actual mailing of the letters except in one instance. The evidence established that each employee who resigned had requested that the letters be prepared for him or had indicated a desire to leave the union and that each had signed the letters willingly.
 
 
 17
 (d)
 
 
 18
 On the morning of the strike, the vicepresident of Flambeau Plastics appeared at the picket line and began taking moving pictures of the picketing strikers. His conduct was repeated every day for at least two months. The vice-president always took pictures of newcomers on the picket line; he also took pictures of the strikers' automobiles and their car licenses. Other company officials took similar pictures. Through a 'News Sheet' issued by the company, the employees who remained on the job were told that the company was keeping a photographic record of the strike.
 
 
 19
 (e)
 
 
 20
 Before the collective bargaining contract became effective in May 1965, it was Flambeau Plastics' policy to grant paid vacations to its employees. That policy, in a more liberal form, was incorporated in the contract.[9] In 1965 the company closed down its operations for vacation purposes during the first week in July. In 1966, however, vacations were scheduled on an individual basis in accordance with the contract's terms from June 1 to December 31, though the contract had expired in May of that year. The employees who remained on the job after the strike began were granted vacations with pay in accordance with the terms of the expired contract. The strikers, however, were never paid for or granted vacations.
 
 
 21
 On December 12, 1966 the union wrote the company, demanding that 'the Company pay to those employees eligible as of August 1, 1965, those vacation benefits that they were entitled to receive during the period June 1, 1966 through December 31, 1966.' The company responded to this demand by writing to the union that 'Flambeau does not recognize the union as representing the majority of its employees and even if it did, we do not believe the union could prosecute a claim for vacation allegedly due.' In addition the company wrote, 'the persons listed * * * are not eligible for vacation benefits pursuant to the terms and conditions of the expired labor contract dated May 17, 1965.
 
 
 22
 (f)
 
 
 23
 The agreement between the company and the union incorporated an employee evaluation procedure which had initially been adopted by the company in 1959. Under this procedure, each production employee's performance was periodically evaluated by his superior to determine whether the employee was qualified to advance in job classification or receive a merit increase in wages. Thus, a new employee was evaluated 44 days from the date of hire to determine whether he would be retained and classified as a class 'D' operator; six months from the date of hire, he was revaluated to determine whether he was qualified to be reclassified as a class 'C' operator; twelve months from the date of hire, he was revaluated to determine whether he was qualified to be reclassified as a class 'B' operator; eighteen months from the date of hire, he was revaluated to determine whether he was qualified to be reclassified as a class 'A' operator.
 
 
 24
 After the strike began, the company accelerated employee promotions from classification to classification in derogation of the contract as well as its previous practice. Twelve employees were promoted to class 'D' after an average waiting period of 16 days from the date of hire; 22 employees were promoted to class 'C' after an average waiting period of slightly over two months from the date of hire; 17 employees were promoted to class 'B' after an average waiting period of approximately three months from the date of hire; and 14 employees were promoted to class 'A' after an average waiting period of five months from the date of hire. By this acceleration in promotions, the company paid the promoted nonstriking employees higher wages than any increase offered to the union during the negotiations.
 
 TRIAL EXAMINER'S BIAS
 
 25
 Flambeau Plastics' threshold contention that the trial examiner was biased against it is without merit. As the Board noted, the company's complaint against the examiner was focused on his findings and conclusions and upon his analysis of the evidence. The company points to no instance that might indicate bias with respect to the hearing itself. In its attempt to establish prejudice, the company points to the fact that the examiner had heard the previous case against it in which he found the company guilty of refusing to bargain, thereby implying that he had prejudged the instant case. The company's argument is specious, particularly in light of the fact that it made no complaint against the examiner hearing the instant charges until after he had rendered the instant decision.
 
 SECTION 8(a)(5) VIOLATIONS
 
 26
 (a)
 
 
 27
 From a reading of the employee handbook, it is apparent that the company deliberately omitted to inform the employees about the grievance procedure stipulated in the union contract, presumably to prevent grievances from being processed by the union.[10] Moreover, by discussing such matters as wages, hours, vacations, seniority, and overtime in the 1965 handbook, and yet omitting any mention of the fact that the contract with the union covered these very matters, the company, in effect, not only belittled the union but also derogated from its collective bargaining status. This same result, in effect, was accomplished by the statements contained in the 'Forward' to the handbook. We agree with the examiner that the handbook invited the employees to disregard and bypass the union. We conclude that substantial evidence on the record considered as a whole supports the Board's finding that the company violated section 8(a)(5) of the Act by this conduct.
 
 
 28
 (b)
 
 
 29
 Flambeau Plastics attempted to implement a 'progressive training program' by filing a unit clarification petition with the Board during the negotiations for a new contract. The announced purpose of the program was to provide training for 'selected employees * * * who upon satisfactory completion of the training would be guaranteed placement' as supervisors, salesmen, accountants, and engineers. Two days after the company filed its petition, the union demanded that the company bargain about the program, but the company refused on the ground that 'the matter was before the NLRB' and that the company 'had taken the proper action through the proper channels.'
 
 
 30
 Whether or not the trainees were to be considered as part of the certified bargaining unit, the company was required to bargain with the union about the program. If the trainees were within the bargaining unit, the company was required, by Section 8(d) of the Act, to bargain with the union concerning the program because it would constitute a change of working conditions within the unit. If the trainees were outside the bargaining unit, they would be doing work which the employees in the unit ordinarily performed. This result would be analogous to subcontracting work formerly done by unit employees and would likewise have obligated the company to bargain with the union concerning the program. Fiberboard Paper Products Corp. v. NLRB, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). Under these circumstances, the company's argument that it had no obligation to bargain concerning the program while the petition for unit clarification was pending before the Board becomes irrelevant.[11] We conclude that substantial evidence on the record considered as a whole supports the Board's finding that the company refused to bargain with the union concerning the establishment of the progressive training program in violation of section 8(a)(5) of the Act.
 
 
 31
 (c)
 
 
 32
 The Board also found that Flambeau Plastics had violated section 8(a)(5) of the Act by refusing to bargain with the union in good faith toward a new contract,[12] by refusing to recognize or bargain with the union after September 15, 1966,[13] and finally by accelerating the reclassification of nonstrikers.[14] We conclude that substantial evidence on the record considered as a whole supports these determinations by the Board.
 
 SECTION 8(a)(3) VIOLATION
 
 33
 ' Under 8(a)(3), it is unlawful for an employer by discrimination in terms of employment to discourage 'membership in any labor organization,' which includes discouraging participation in concerted activities, * * * such as a legitimate strike.' NLRB v. Erie Resistor Corp., 373 U.S. 221, 233, 83 S.Ct. 1139, 1148, 10 L.Ed.2d 308 (1963).
 
 
 34
 The company concedes that notwithstanding the expiration of the contract on May 17, 1965, it continued to grant to nonstriking employees vacations and vacation pay in accordance with the terms of the contract. On the other hand, the company refused to grant vacation pay to the strikers. In NLRB v. Great Dane Trailers, Inc., 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967), the Supreme Court was confronted with a situation identical in relevant aspects to that in the instant case. In Great Dane Trailers, the employer refused to pay vacation benefits to strikers under the terms of an expired collective bargaining agreement although granting such benefits to nonstrikers. The Court said of this conduct: 'There is little question but that the result of the company's refusal to pay vacation benefits to strikers was discrimination in its simplest form.' 388 U.S. at 32, 87 S.Ct. at 1796. The Court made this further observation: 'The act of paying accrued benefits to one group of employees while announcing the extinction of the same benefits for another group of employees who are distinguishable only by their participation in protected concerted activity surely may have a discouraging effect on either present or future concerted activity.'[15] 388 U.S. at 32, 87 S.Ct. at 1797.
 
 
 35
 In accordance with the holding in Great Dane Trailers, it was incumbent upon Flambeau Plastics to demonstrate that its discrimination against the strikers in refusing to grant them vacation pay was motivated by legitimate objectives.[16] The company did not meet this obligation. In an attempted justification, the company argues that since the strike began on June 15, the strikers were 'absent for more than 'six calendar weeks' prior to August 1, 1966.' Consequently, the company's argument continues, the strikers were not continuously on the 'payroll,' as that term is defined in the contract, 'during the year preceding August 1, 1966,' thereby making the strikers ineligible for vacation benefits under the contract. The company is mistaken that the vacation eligibility date was August 1, 1966. It is clear from an analysis of both the precontract practice and the contract itself that the terminal date for vacation eligibility was August 1, 1965. Thus, those employees who had worked for the year previous to August 1, 1965 and who had also worked up to the date of the strike on June 15, 1966 were eligible for vacations with pay regardless of whether they were strikers or nonstrikers.
 
 
 36
 The company seeks further to justify its position respecting vacation pay by arguing that the strikers were not eligible for such pay under either the contract or the continuing company policy inasmuch as the contract provided that 'vacation pay is incidental to vacation time off and is not considered to accrue for each day or month of employment.' The company's argument continues: since no striker had taken 'vacation time off' or had worked up to the last scheduled workday before his 'vacation time off,' the strikers were not eligible for vacation pay. The answer to this argument is that those strikers who were eligible for vacation benefits were eligible before the strike started on June 15, 1966. Since vacations could be taken at any time between June 1, 1966 and December 31, 1966, when the employees went off the job on June 15, 1966, their action was tantamount to taking 'vacation time off.'
 
 
 37
 We agree with the Board's determination that the company's actions with respect to vacation pay were discriminatory and conclude that substantial evidence on the record considered as a whole supports the finding of a violation of section 8(a)(3) of the Act.
 
 SECTION 8(a)(1) VIOLATIONS
 
 38
 We do not think any elaboration or discussion is necessary to dispose of the routine questions arising from the section 8(a)(1) violations found by the Board. We have considered these questions in light of the contentions made by the company and conclude that the Board's findings are supported by substantial evidence on the record considered as a whole.
 
 
 39
 Finally, we hold that the Board's determination that the strike was caused and prolonged by the company's unfair labor practices is supported by substantial evidence on the record considered as a whole.
 
 
 40
 The Board's order will be enforced.
 
 
 
 [1]
 The decision and order of the Board are reported at 167 N.L.R.B. No. 102 (1967)
 
 
 [2]
 Local 380 filed a brief in this court supporting the Board's order
 
 
 [3]
 The Board adopted the trial examiner's findings without modification
 
 
 [4]
 The same trial examiner conducted the hearing on the charges under review in the instant proceeding
 
 
 [5]
 The decision and order of the Board are reported at 151 N.L.R.B. No. 610 (1965)
 
 
 [6]
 The only other reference to the union in the handbook was also contained in the 'Forward':
 Relative to union membership, the above agreement provides for an 'Open Shop.' Therefore, it is not necessary for you to either become, or, if you are already a member, to remain a member of the Union in order to work at Flambeau. On the other hand, the law gives you the right to join the Union should you so desire. This places the matter of union membership directly in your own hands for your own decision. Remember-- you don't have to join the Union, but you can if you wish.
 
 
 [7]
 In February 1966 the union filed an unfair labor practice charge against the company, alleging a section 8(a)(5) violation by the issuance of the handbook in derogation and misrepresentation of the collective bargaining status of the union
 
 
 [8]
 Upon learning of the company's action, the union filed additional unfair labor charges of refusal to bargain
 
 
 [9]
 With respect to vacations, the contract provided in pertinent part: Employees who during the year preceding August 1 were continuously on the payroll of the Company for the previous year and work up and through the last scheduled workday prior to the declared vacation period, will be eligible for vacation time off and pay on the following basis:
 
 
 [1]
 One, but less than three years of employment as of August 1-- One (1) week
 
 
 [2]
 Three, but less than fifteen years of employment as of August 1-- Two (2) weeks. 3. Fifteen or more years of employment as of August 1-- Three (3) weeks. * * * An employee absent during the declared vacation period, if otherwise qualified, will receive vacation pay only upon return to work, except if such absence is due to industrial injury. * * * The Company shall have the option of shutting down operations for vacations, provided that the notice of such shutdown shall be posted not later than May 1 of each year. * * * It is the intention of the parties to this Agreement by these vacation provisions to provide for time off from active employment with pay for vacation purposes. Vacation pay is incidental to vacation time off and is not considered to accrue for each day or month of employment
 
 
 [10]
 The company argues that the fact that 'there had not been one grievance presented by the union in accordance with the rights available under the agreement' indicates that the omissions in the handbook were of no consequence. However, this fact just as arguably indicates how effective the handbook was in short-circuiting the contractual grievance procedure
 
 
 [11]
 The fact that the company filed a unit clarification petition with the Board belies the company's argument that it had merely 'created the plan intellectually.'
 
 
 [12]
 The record confirms the Board's observation in its brief filed with this court:
 The Company's history of unfair labor practices, its repeated attempts to undermine and disparage the Union, its inflexibility at the bargaining table, its refusal to engage in any meaningful bargaining concerning union security and a dues check-off provision, its insistence that it retain complete control over all facets of the employment relationship, and its refusal to grant the Union any significant new benefits which its employees did not have without the Union, all provide ample record support for the Board's finding that the Company simply repeated its earlier performance at the bargaining table, and again, did not meet its legal obligation to bargain with the Union in good faith.
 
 
 [13]
 The vice-president of the company testified at the hearing that the normal complement of employees numbered around 170; that of the 91 employees who had gone on strike, he had heard that 27 had found employment elsewhere, leaving only 64 union adherents. He further testified that replacements of strikers plus those who did not go on strike composed a working force of 115 at the company in September 1966. Since the union strength at that time was 64, according to his calculation, by adding that figure to the work force of 115, he arrived at a total work force of approximately 170. The company took the position that the 64 union members did not constitute a majority of the 170 employees
 Regardless of whether the company correctly calculated that the union had lost its majority status on September 15, the company could not take advantage of the alleged defections so as to justify its refusal any longer to recognize and bargain with the union. The examiner found that the evidence showed that the company's previous unfair labor practices were responsible for whatever diminution in union membership had occurred. We have already held some of these findings of unfair labor practices to be supported by substantial evidence of record. (See infra pp. 11-13 for other company conduct which we hold to be unfair labor practices.) Substantial evidence of record also supports the examiner's conclusion with respect to the diminution in union membership. NLRB v. Poultry Enterprises, Inc., 207 F.2d 522 (5th Cir. 1953).
 
 
 [14]
 The law is settled that an employer may not unilaterly effect a new system of merit increases in wages during bargaining and without consultation with the union. NLRB v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962)
 
 
 [15]
 Under 7 of the Act, the striking employees at Flambeau Plastics were engaged in protected concerted activities. NLRB v. Erie Resistor Corp., 373 U.S. 221, 233, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963)
 
 
 [16]
 The Supreme Court held:
 Once it has been proved that the employer engaged in discriminatory conduct which could have adversely affected employee rights to some extent, the burden is upon the employer to establish that it was motivated by legitimate objectives since proof of motivation is most accessible to him. 388 U.S. at 34, 87 S.Ct. at 1798.