# UNITED STATES COURT OF APPEALS
## Tenth Circuit
## Byron White United States Courthouse
## 1823 Stout Street
## Denver, Colorado 80294
## (303) 844-3157

Patrick J.  Fisher, Jr.                                                    Elisabeth A. Shumaker
Clerk                                                                      Chief Deputy Clerk

August 6, 1996


**TO:** ALL RECIPIENTS OF THE CAPTIONED OPINION

**RE:** 95-9526 Capitol Steel v. NLRB
       July 10, 1996 by The Honorable Carlos F. Lucero


       Please be advised of the following correction to the captioned decision:

       On pages seven and nine, The National Labor Relations Board was incorrectly
identified.

       Enclosed please find a corrected opinion.

                                        Very truly yours,

                                        Patrick Fisher, Clerk



                                        Beth Morris
                                        Deputy Clerk


encl.

**UNITED STATES COURT OF APPEALS**

**Filed 7/10/96**

**TENTH CIRCUIT**

CAPITOL STEEL AND IRON
COMPANY,

    Petitioner,

v.

                                    No. 95-9526

NATIONAL LABOR RELATIONS
BOARD,

    Respondent.

**PETITION FOR REVIEW OF AN ORDER OF
THE NATIONAL LABOR RELATIONS BOARD
(Board Case Nos. 17-CA-17584 & 17-CA-17721)**

Charles W. Ellis (W. Davidson Pardue with him on the briefs) of Lawrence & Ellis, P.A.,
Oklahoma City, Oklahoma, for Petitioner.

Meredith L. Jason (Linda Dreeben with her on the brief) of National Labor Relations
Board, Washington, D.C., for the Respondent.

Before **PORFILIO**, **BARRETT** and **LUCERO**, Circuit Judges.

**LUCERO**, Circuit Judge.

    We are asked to resolve the following question: If a collective bargaining

agreement contains a provision permitting an employer to grant wage increases to any of

its employees in any amount, is the employer shielded from unfair labor practice charges based on the grant of such increases, regardless of the timing and manner in which it bestows them? In the case before us, the National Labor Relations Board ("Board") held that although Capitol Steel & Iron Company ("Capitol" or "Company") had a contractual right to grant raises without bargaining, it unilaterally granted raises to certain employees in the midst of the collective bargaining process in such a manner as to violate § 8(a)(1) and § 8(a)(5) of the National Labor Relations Act. 29 U.S.C. §§ 158(a)(1), (5). Exercising jurisdiction under §§ 10 (e) and (f) of the NLRA, 29 U.S.C. §§ 160 (e), (f), we grant enforcement of the Board's order.

## I

Shopmen's Local Union No. 620 of the International Association of Bridge, Structural and Ornamental Iron Workers, AFL-CIO ("Union") represents Capitol's employees. Capitol and the Union agreed to a collective bargaining agreement ("Agreement") for the period from September 1, 1993, to August 31, 1994. The Agreement contained a provision permitting the Company to "pay wages in excess of the minimum requirements . . . to one or more employees in different amounts to different employees." Capitol Steel & Iron Co., 317 N.L.R.B. 809, 810 (1995). The present dispute arose while the Agreement was in effect, and concerned the wage increase provision.

On August 1, 1994, the Company and the Union began to negotiate a new agreement. Among other proposals, the Union suggested a $1 per hour raise for all employees. It also sought participation in the International Union's pension plan. An officer of the company requested a copy of the "form 5500," containing information about the pension fund, and the Union agreed to furnish this information at the next meeting. The Company agreed to consider the Union's proposals, and the parties ended negotiations without setting a date for their next meeting, in light of a pending decertification election. The Union won that election on August 4, 1994.

The two sides did not meet again until August 30, the penultimate day of the 1993-1994 Agreement. The Union presented a revised proposal which included an across-the-board wage increase and different minimum wages for different job categories. The Company rejected the proposed increase and appeared unwilling to negotiate on the subject. The Company president, John Nesom, took the floor to explain that the Company had been faring very poorly, so much so that he and his wife had been forced to invest their own assets in the Company. He stated that the previous year had been particularly bad. However, Nesom then promised to pass on profits to the employees when it was possible to do so, and -- in a reversal of his position -- stated that the Company had been evaluating its situation for the last five months and had decided to give raises to some employees. Nesom later testified that these raises were given to

reward employee performance, and to convince the employees "to be on our side" as they went to the Union meeting to vote on the Company's proposal. Id. at 811.

Negotiations went on with some progress on other terms, and continued the following morning, August 31. At that point, the Union provided the Form 5500 which the Company had requested. After talks continued for some time, a union official asked the Company who had gotten raises, how much each had received, and why and when they had received the increases. Nesom declined to give particulars, merely stating that two men in the room had received raises; all of the recipients would find out as of their next paychecks (which were to be distributed on September 9); and the raises were given out based on the criteria of attitude, attendance and skill.

At the end of the day's meeting, Nesom asked whether and where the Union planned to meet to discuss the management's last proposal. A union official told him the name of the restaurant where the meeting was to take place, and asked if the Union had received the Company's "last best and final offer." Nesom replied that they had.

Just after negotiations adjourned, as employees were leaving the plant to go to the Union meeting, Nesom and Larry Ozment, vice president in charge of production, handed some of them notices that they had received raises. At the meeting these employees questioned whether the Union had negotiated the raises and expressed concern that they would be withdrawn if they voted to reject Capitol's proposal. David Turnbull, the International Union's district representative, replied that the Union had been generally

informed about the raises but had not agreed to them or retracted its own across-the-board wage increase proposal. At a certain point, Ozment briefly entered the meeting room and passed out two more raise notices to two employee members of the Union negotiating committee. Because the papers were passed from hand to hand en route to their recipients, others could see their contents.

Later during the same Union meeting, the employees voted to reject the Company's latest offer. Turnbull passed this information on to the Company. Spurred by the appearance of a company representative at the Union meeting, by the Company's apparent attempt to influence voting by its distribution of raises just before and during the meeting, and by its failure to supply specific information on the raises, the group voted to strike.

That evening, Nesom and Richard Fenner, executive vice president of Capitol, called each of the employees with the following message:

> We have been advised by the Union that Union members have voted to strike instead of accepting the Company's contract offer.
> We anticipate that a picket line will be placed on the Agnew entrance to the plant tomorrow morning.
> We want you to know you have a right to cross the picket line to come to work. No one can legally prevent you from doing this if you choose to.
> However, if you decide to not report for work, the Company does plan to replace any employee who does not clock-in and your job may be permanently filled by a replacement hired in your absence.
> We hope you will choose to come to work. The Company needs you and your support.

Capitol Steel, 317 N.L.R.B. at 811-12. When the employees arrived at the Company the following morning, September 1, Nesom handed them papers bearing the same message.

The Union filed unfair labor practice charges on September 2, charging the company with violations of §§ 8(a)(1), (3) and (5). The Company continued to refuse to bargain on wages as the strike wore on. In a letter dated September 15, 1994 and received the following day, Capitol finally revealed the names of those receiving wages and the amount of each increase.

The Company rejected two offers to return to work. On September 25, Felipe Olivas called Ozment and asked to return. Ozment told Olivas that his position had been filled. On September 27, upon discovering that the NLRB was planning to act on the unfair labor practice charges, the rest of the employees voted to end their strike. However, when Turnbull relayed their offer to return, the Company refused to respond via a Union intermediary, and ultimately stated that all of the workers' jobs had been filled. Meanwhile, one employee had offered to return to work on his own and had been accepted back.

On October 7, Ozment called employee Ollie Clay and offered him a job. Reluctant to return before others with greater seniority than himself, Clay consulted Turnbull and ultimately decided not to return before those other employees. Turnbull expressed this to Fenner, and requested that the two sides meet to bargain about the order of reinstatement. Negotiations about whether the two sides could bargain on this topic

continued over a number of days, but none of the employees were given back their positions. The Union eventually amended its unfair labor practice charges to include charges of failing and refusing to reinstate unfair labor practice strikers upon their unconditional offers to return to work.

An administrative law judge tried this case in Oklahoma City on January 24, 1995. He concluded that: (1) Capitol's unilateral grant of wage increases, while the Company refused to negotiate over wage increases, and its failure to timely provide information about the increases, were unfair labor practices in violation of §§ 8(a)(5) and (1) of the NLRA; (2) the strike, because it was caused and prolonged by these unfair labor practices, was an unfair labor practice strike; (3) the Company's solicitations and threats to striking workers violated § 8(a)(1); and (4) the Company's failure to reinstate unfair labor practice strikers to their jobs immediately following their unconditional offers to return violated §§ 8(a)(3) and (1). The ALJ recommended that Capitol be ordered to cease and desist from these unfair labor practices and immediately reinstate the strikers with backpay. The Company timely filed exceptions to the ALJ's decision.

The Board affirmed the ALJ's rulings, findings and conclusions of law and adopted his recommended order. The Company's petition for review and the Board's cross-application for enforcement followed.

**II**

We first review the Board's determination that the manner in which the Company gave wage increases and its failure to provide information on those increases were unfair labor practices. We grant enforcement if the NLRB correctly interpreted and applied the law, and if its findings were supported by substantial evidence in the record, considered in its entirety. Presbyterian/St. Luke's Medical Center v. NLRB, 723 F.2d 1468, 1471 (10th Cir. 1983).

## A

With respect to the wage increases, Capitol argues that the wage increase provision in the Agreement gave it the absolute right to increase or decrease any employees' wages whenever and however it chose, if those wages remained above the prescribed minimum of $ 5.50 per hour. It asserts that the exercise of a valid contractual right cannot be the basis for an unfair labor practice finding. The cases upon which the Company relies for this premise, however, are not dispositive because they fail to address specifically the present context: the exercise of an otherwise valid right in a manner designed to undermine the Union. See NLRB v. United States Postal Service, 8 F.3d 832 (D.C. Cir. 1993) (upholding postal service's exercise of contractual right to reduce employees' hours in response to budget reduction); Ace Beverage Company, 253 N.L.R.B. 951 (1980) (rejecting union's attempt to recover vacation benefits for strikers, because employer had contractual right to refuse to count strike time toward vacaction eligibility); Roeglein Provision Company, 181 N.L.R.B. 578 (1970) (same). In none of these cases did the

Board find anti-union motivation in the employer's exercise of the right at issue, as it did here. Capitol Steel, 317 N.L.R.B. at 813.

For its part, the Board asserts that by granting a wage increase in a manner designed to undermine the Union's status as the employees' exclusive bargaining representative, the Company failed to carry out its obligation to bargain in good faith. However, like the Company, the Board fails to offer apposite authority. None of the cases the Board cites to demonstrate the illegality of undermining a union's status involve conduct in which the employer claims it is contractually entitled to engage. See Medo Photo Supply Corp. v. NLRB, 321 U.S. 678 (1944) (no claim that challenged practices were permitted by existing contract); Szabo v. U.S. Marine Corp., 819 F.2d 714 (7th Cir. 1987) (same); Hedstrom Co. v. NLRB, 629 F.2d 305 (3d Cir. 1980) (same), cert. denied, 450 U.S. 996 (1981); J.P. Stevens & Co. v. NLRB, 623 F.2d 322 (4th Cir. 1980) (same), cert. denied, 449 U.S. 1077 (1981); Flambeau Plastics Corp. v. NLRB, 401 F.2d 128 (7th Cir. 1968) (same), cert. denied, 393 U.S. 1019 (1969).

The present dispute captures a tension between two interests central to employer-employee relations under the NLRA: facilitating collective bargaining over mandatory subjects and enforcing valid contracts.

The NLRA requires an employer to bargain collectively -- i.e., to meet at reasonable times and confer in good faith, but not necessarily to reach agreement -- over wages, among other terms and conditions of employment. 29 U.S.C. §§ 158(a)(5), (d).

Generally, an employer violates its duty to bargain in good faith if it makes a unilateral change in a mandatory bargaining subject -- for instance, unilaterally granting a raise -- without first bargaining in good faith to an impasse. See Litton Financial Printing Div. v. NLRB, 501 U.S. 190, 198 (1991); Intermountain Rural Elec. Ass'n v. NLRB, 984 F.2d 1562, 1566 (10th Cir. 1993). A unilateral change in conditions of employment which are under negotiation "is a circumvention of the duty to negotiate which frustrates the objectives of § 8(a)(5) much as does a flat refusal" to negotiate. NLRB v. Katz, 369 U.S. 736, 743 (1962). By the same token, an employer may violate § 8(a)(5) by making an otherwise innocuous announcement about working conditions which, due to its timing and/or manner, reflects a design to undermine the union in its role as the employees' sole bargaining representative. Hedstrom, 629 F.2d at 317 ("an employer violates § 8(a)(5) and (1) if he makes announcements concerning work conditions which, even if they do not contain material changes from existing conditions, are designed by their timing and wording to undermine the employees' bargaining representative."); Flambeau Plastics, 401 F.2d at 134 (release of company handbook which had been issued in previous editions in other years violated § 8(a)(5) because it was revised in ways designed to invite workers "to disregard and bypass the union").

It is also well established that unions can waive their right to bargain over wages or other mandatory bargaining subjects. Robert A. Gorman, Basic Text on Labor Law, 466 (1976). Such a waiver is often expressed by means of an explicit collective

bargaining agreement provision like the present one.  Id. at 469.  Generally, it is unsound

to permit a union to claim that a waiver provision is illegal, because the union presumably

forfeited statutory rights in exchange for some concession on the employer's part, and

therefore it does not undermine the union's status or the stability of the contract to uphold

the provision.  Id. at 466.  Waivers of statutory bargaining rights must be "clear and

unmistakable" in order for courts to enforce them.  Metropolitan Edison Co. v. NLRB,

460 U.S. 693, 708 (1983); NLRB v. Oklahoma Fixture Co., 79 F.3d 1030, 1037 (10th Cir.

1996).

Although waiver provisions are an acceptable and potentially beneficial part of the

collective bargaining process, it does not follow that we should countenance the

calculated use of such clauses to undermine the process.  It is difficult to imagine a

clearer example of an employer granting a benefit in such a manner as to undermine the

collective bargaining process than the present case.  The ALJ made the following

findings, which are supported by substantial evidence in the record:

> Respondent . . . [granted the increases] unilaterally, while engaged in
> collective bargaining with the Union.  In that bargaining, Respondent had
> refused to make any proposal for a wage increase, had stated that it could
> not agree to having any minimum wages set by negotiation, and in virtually
> the same breath with its announcement of the unilateral increases, had
> stressed its perilous financial condition.  Moreover, Nesom misstated how
> long the increases had been under consideration . . . .  He also mislead [sic]
> the Union about when the employees would learn of this increase, telling
> the committee that they would learn of it with their next paycheck, due
> September 9, and then rushing to personally inform them on August 31.
> Most significantly, as Nesom admitted, the increases were
> announced in such a way and at such a time as to sway the employees who

would immediately thereafter vote on Respondent's "last and final offer." Indeed, the manner in which Ozment passed out the notices to Clay and Prock at the ratification meeting was calculated to sow dissension and demean the role of the Union.

Capitol Steel, 317 N.L.R.B. at 813.

We agree with the Board that the timing and manner in which Capitol gave out raises to its employees violated its duty to bargain. We presume the Union gained something in exchange for waiving its right to bargain over wages, and we acknowledge the importance of the waiver principle to the bargaining process. However, we decline to endorse the notion that that principle can be implemented to subvert that process. The provision in question here entitled the Company to implement raises unilaterally during the term of the contract. However, when the Company undermined the union's role as the employees' sole bargaining agent by raising wages in a manner engineered to influence employees to vote in its favor at a key moment in the bargaining process, it improperly exploited that waiver and violated §§ 8(a)(5) and (1) of the NLRA.

**B**

The Board's § 8(a)(5) and § 8(a)(1) findings were based not just on the timing and manner of the wage increases, but on the Company's failure to timely furnish information requested by the Union concerning the increases: namely, who, how much, when and why. The Company argues that the alacrity with which it provided the wage increase information should be judged in light of the Union's slow response to its request for the Form 5500, and suggests that it provided the information as promptly as it could have.

- 13 -

The Board counters that in the context of this dispute -- where the information sought was simple and readily available and the Company had no reason not to hand it over -- the delay was unreasonably long, and it rejects the contention that the Union's own delay is relevant.

An employer must provide the union with information necessary to the performance of its duties. NLRB v. Acme Industrial Co., 385 U.S. 432, 435-36 (1967). This duty requires "an honest effort to provide whatever information is required as promptly as circumstances allow." Decker Coal Co., 301 N.L.R.B. 729, 740 (1991). It is appropriate to consider whether the nature of information is conducive to rapid response, and whether the information is readily obtainable in the employer's files, in assessing whether the employer's delay is great enough to violate its duty. See, e.g., Tubari, Ltd., 299 N.L.R.B. 1223, 1228 (1990).

We agree with the Board that the Company's delay was unreasonably long in this case. The Union first requested the information on August 30, and did not receive it until September 16. The information was simple and readily accessible. As the Board pointed out, the Company apparently was able to produce notices which were passed out to the employees between the end of the August 31 meeting, at 2 p.m., and the time the employees left for the Union meeting, at 2:30. Furthermore, during most of the two-week period of delay, the employees were on strike, "warranting a little extra effort toward achieving a negotiated resolution." Capitol Steel, 317 N.L.R.B. at 813. Finally, the

- 14 -

Union's sluggishness in providing the Form 5500 does not relieve the Company of its duty to provide the wage increase information.

### III

A strike which is motivated, even in part, by an employer's unfair labor practices is an unfair labor practice strike. Harding Glass Indus., Inc. v. NLRB, 672 F.2d 1330, 1338-39 (10th Cir. 1982). In the instant case, the Board found that the Union's work stoppage was an unfair labor practice strike, a finding which is pivotal to the issues discussed in the following two Parts of this opinion. The Company contests this, because as discussed above, it denies that its granting of wage increases or refusal to furnish requested information was an unfair labor practice. We disagree. The Board correctly determined that unfair labor practices were committed. Furthermore, substantial evidence in the record supports the finding that the Company's unfair labor practices motivated the employees in their decision to strike. Accordingly, we conclude that the Board correctly identified the Union's strike as an unfair labor practice strike.

### IV

The Board found that by making solicitations and threats to the workers as they prepared to strike, the Company had violated § 8(a)(1) of the Act. The Company argues that because the strike was economic in nature and not an unfair labor practice strike, its communications to the employees were permissible. Our holding that the work stoppage *was* an unfair labor practice strike disposes of this argument.

Because the law prohibits the permanent replacement of unfair labor practice strikers, NLRB v. International Van Lines, 409 U.S. 48, 50-51 (1972), threatening unfair labor practice strikers with permanent replacement if they do not return to work unconditionally is itself a violation of § 8(a)(1). NLRB v. King Radio Corp., 416 F.2d 569, 572-73 (10th Cir. 1969), cert. denied, 397 U.S. 1007 (1970); Storer Communications, Inc., 294 N.L.R.B. 1056, 1093 (1989). Substantial evidence supports the finding that the Company gave this message to its employees by phone the night before the strike, and in writing just before the strike began. We therefore hold that the Board was correct in finding that these communications violated § 8(a)(1).

## V

Finally, Capitol challenges the Board's conclusion that it violated §§ 8(a)(3) and (1) of the NLRA by failing to reinstate unfair labor practice strikers when they unconditionally offered to return to work. See International Van Lines, 409 U.S. at 50-51; Harding Glass, 672 F.2d at 1338. First, it argues that the employees were not unfair labor practice strikers. We have already disposed of this issue. Second, Capitol claims that the employees did not make an unconditional offer to return; by seeking to negotiate over the order of reinstatement, the employees rendered their offer to return conditional. We reject this argument as well.

Substantial evidence supports the Board's findings that both employee Olivas' offer to return on September 25 and the Union's offer, on behalf of the rest of the

- 16 -

workers, on September 27, were "clearly and unequivocally unconditional." Capitol Steel, 317 N.L.R.B. at 814. Capitol's obligation to reinstate the employees arose immediately, Pillowtex Corp., 241 N.L.R.B. 40, 48 n. 18 (1979), enf'd, 615 F.2d 917 (5th Cir. 1980), and thus it cannot be argued that the Union's request, almost two weeks later, to discuss the order of reinstatement relieved the Company of its obligation. It was the Company's failure to carry out this duty which occasioned the Union's request. The order of reinstatement would be a moot consideration if the duty had been properly carried out. Capitol "may not rely on later union demands made in response to a situation created by [its own] failure to reinstate the strikers" as a basis for arguing that the Union's initial offer to return was conditional. J.M. Sahlein Music Co., Inc., 299 N.L.R.B. 842, 848 (1990). In any case, because the employees were all entitled to immediate reinstatement, it is difficult to see how a request to bargain over the order of reinstatement constitutes a condition. As the Board pointed out, the request was akin to asking for something to which the Union was already entitled. Capitol Steel, 317 N.L.R.B. at 814. We agree. The Company's failure to reinstate the employees when they offered to return was a violation of §§ 8(a)(1) and (3) of the Act.

## VI

For the reasons stated above, we DENY Capitol's petition for review and GRANT enforcement of the Board's order in all respects.