**Wayne GENSER, et al., Plaintiffs,**

v.

**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL NO. 134, et al., Defendants.**

**No. 77 C 923.**

United States District Court, N. D. Illinois, E. D.

Sept. 29, 1981.

**1154**

Andrew J. Bootz, Mount Prospect, Ill., for plaintiffs.

Stephen B. Rubin, Asher, Greenfield, Goodstein, Pavalon & Segall, Irving B. Ribstein, Gerald D. Skoning, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge.

Plaintiffs Wayne and Donna Genser (the "Gensers") are the owners of an electrical contracting business. They bring this antitrust action against the defendants International Brotherhood of Electrical Workers Local # 134 (the "Union"), New United, Inc. ("New United"), the Electrical Contractors Association of the City of Chicago, Inc., ("ECAC"), and two business agents for the Union, Bert Van Wetering and Angelo Mazzone.[1]

In Count I of their Amended Complaint, the Gensers charge that defendants conspired to restrain competition among electrical contractors in Cook County, Illinois, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 *et seq.* They further charge that defendants, individually or in combination, monopolized or attempted to monopolize the electrical contracting business, in violation of Section 2 of the Sherman Act. As a result of these violations, the Gensers allege they lost certain contracts with Capitol for electrical work at

1. Capitol Construction Company ("Capitol") is named as a co-conspirator but not as a defendant.

the North Riverside Mall. In Counts II and III, the Gensers charge a violation of the Illinois antitrust laws and tortious interference with contractual relations.

This suit was filed in 1977. After two years of extensive discovery, all defendants filed motions for summary judgment. The common basis for these motions is that plaintiffs have failed to allege any facts from which the existence of a conspiracy can be inferred.[2]

The existence of a conspiracy in this case is crucial. It is an essential element of any violation of Section 1 of the Sherman Act. Plaintiffs have also alleged that defendants violated Section 2, which does not require a conspiracy, but an analysis of the circumstances of this case indicates that none of the defendants, acting alone, could have monopolized or attempted to monopolize the electrical contracting business.

An essential element of a Section 2 violation is the possession of "monopoly power" or the "dangerous probability" of monopoly power. *United States v. Grinnel Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966); 1 Von Kalinowski, *Antitrust Laws and Trade Regulation* § 802[1]. Plaintiffs have not alleged any facts from which it could be inferred that New United or ECAC possessed the requisite monopoly power or the dangerous possibility of it.

· It is logically impossible for the Union, acting alone, to monopolize or attempt to monopolize the electrical contracting business. Monopoly power depends on the possession of sufficient control of the relevant market to constitute a monopoly. Von Kalinowski, *id.* The relevant market is that area of goods or services in which the defendant competes. *Id.* The Union's relevant market is labor, not the electrical contracting business; thus the Union could not unilaterally monopolize or attempt to monopolize the electrical contracting market.

In summary, as none of the defendants, acting alone, could have monopolized or attempted to monopolize the electrical contracting industry, whether summary judgment is appropriate depends on whether the Gensers have alleged facts from which the existence of a conspiracy may be inferred. As explained below, the court concludes that the Gensers have failed to do so, and grants summary judgment in favor of the defendants.

### Standard for Summary Judgment

The Seventh Circuit has explicitly delineated the appropriate role of summary judgment procedures in antitrust litigation. *Havoco of America, Ltd. v. Shell Oil Co.*, 626 F.2d 549, 553 (7th Cir. 1980). The basic principle is that the court must not dismiss the complaint unless it is clear that the plaintiff could prove no set of facts entitling him to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). Summary procedures must be used "sparingly" in cases "where motive and intent play leading roles," *Poller v. Columbia Broadcasting System*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), and the pleadings in private treble damage actions must be afforded liberal construction, *Austin v. House of Vision, Inc.*, 385 F.2d 171 (7th Cir. 1967). A party moving for summary judgment must show that there is no genuine issue of material fact, after all evidence and any inferences drawn from that evidence are construed in the light most favorable to the non-moving party. *United States v. Diebold*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); F.R.Civ.P. 56.

Although this standard is exacting, there are antitrust cases where summary judg-

---

**2.** The Union also argues that any restraint of trade was not directed against interstate commerce and only affected local trade, citing *Albrecht v. Kinsello*, 119 F.2d 1003 (7th Cir. 1941). Although *Albrecht* is very similar to the present case, its continued validity must be questioned in light of *United States v. Employing Plasterers' Association*, 347 U.S. 186, 74 S.Ct. 452, 98 L.Ed. 618 (1954). See also *United States v. Finis P. Ernest, Inc.*, 509 F.2d 1256 (7th Cir.), *cert. denied*, 423 U.S. 893, 96 S.Ct. 191, 46 L.Ed.2d 124 (1975). The Union, moreover, raised this argument almost as an afterthought. In any case, there is insufficient data in the record to justify the conclusion that the effect of any restraint on interstate commerce is insubstantial.

ment is appropriate. *Lupia v. Stella D'Oro Biscuit Co.*, 586 F.2d 1163, 166–67 (7th Cir. 1978), *cert. denied,* 440 U.S. 982, 99 S.Ct. 1791, 60 L.Ed.2d 242 (1979).

> "[O]nce the moving party has met the burden imposed by Rule 56 and has demonstrated that the facts on which the plaintiffs rely are not susceptible of the interpretation sought to be given them, plaintiffs must show the existence of *significant probative evidence* supporting the inference urged by them or face summary judgment dismissing the complaint."

*Weit v. Continental Illinois National Bank & Trust Co.*, 467 F.Supp. 197, 208 (N.D.Ill. 1978), *aff'd.*, 641 F.2d 457 (7th Cir. 1981) (emphasis added).

In *Weit*, after eight years of litigation and extensive discovery, the plaintiffs were relying on circumstantial evidence—parallel rates and the opportunity to conspire—to establish the existence of a price-fixing conspiracy. The defendants produced uncontradicted deposition testimony negating any conspiracy. The Seventh Circuit held that this shifted the burden back onto the plaintiffs.

> "[W]hen defendants come forward with denials sufficient to shift the burden under Rule 56(e), plaintiffs must come forward with some significant probative evidence which suggests that [the circumstantial evidence] is the result of an unlawful agreement. Parallel behavior and the hope that something further can be developed at trial is not sufficient to warrant a trial on the merits .... If plaintiffs are to proceed to trial, they must be able to point to some probative evidence that [the allegedly unlawful conduct] resulted from unlawful agreement rather than lawful business reasons."

641 F.2d at 462 (citations omitted).

Although the instant case does not involve a price-fixing conspiracy, the Seventh Circuit's analysis is equally applicable here. As in *Weit*, the litigation here has gone on for some time and there has been extensive discovery. As did the *Weit* plaintiffs, the Gensers rely on circumstantial evidence to establish the existence of a conspiracy, and the Union, ECAC and New United deny the existence of any concerted action, as did the *Weit* defendants. The burden thus shifts back to plaintiffs to come forward with "significant probative evidence" showing that defendants' actions were the result of an unlawful agreement. This plaintiffs have failed to do.

In their complaint, plaintiffs do not allege any overt acts in furtherance of the conspiracy, merely alleging the existence of a conspiracy between defendants and Capitol to restrain trade in the electrical contracting business. Plaintiffs allege that, by the terms of this conspiracy, the conspirators agreed to restrict who could engage in the electrical contracting business in Cook County, to favor those who gave bribes to the Union and its agents, and to eliminate those who refused to do so.

From these allegations, it is clear that the heart of plaintiffs' complaint is that Van Wetering and Mazzone attempted to extort illegal payments from the Gensers, and that when the Gensers refused, they were driven out of business. Assuming these allegations are true, they constitute an antitrust violation only if an agreement existed between the Union or its agents and other electrical contractors.

### Plaintiffs' Factual Allegations [3]

Wayne Genser alleges that on October 7, 1974, he "notified IBEW Local # 134, by letter, that he was becoming an electrical contractor in their area." [4] He then alleg-

---

**3.** These allegations are taken from Plaintiffs' Memorandum in Support of their Motion for Summary Judgment (Pls. Memo in Support), Memorandum in Opposition to Defendants' Motions for Summary Judgment (Pls. Memo in Opposition), Reply Memorandum in Support, and Supplemental Memorandum, and are based on the depositions and discovery conducted in the case.

**4.** Plaintiffs' Memo in Opposition at 3. The letter to which he refers, however, is dated October 23, 1974, and merely states: "In the very

es[5] that in January, 1975, he was introduced to defendant Angelo Mazzone by John Litrenta, the electrical inspector for the Village of Elmwood Park. Mazzone allegedly informed Genser that it was necessary to pay a bribe in order to obtain Union cooperation in Cook County, Illinois.[6]

In July, 1975, Genser contracted to perform electrical work at a real estate office in the Plaza Verde shopping center in Buffalo Grove, located in Cook County. Genser met with defendant Burt Van Wetering, who is the Union's business agent in that area. At this meeting, Genser signed a "B" letter of assent with defendant IBEW, Local # 134.[7]

Local # 134 has a collective bargaining agreement with ECAC, which is a multi-employer association. This collective bargaining agreement is referred to as the "Principle Agreement" or "Agreement." Individual contractors who are members of ECAC are parties to the Agreement by virtue of their membership. An electrical contractor who does business in Cook County but is not a member of ECAC could become a party to the Agreement by signing a letter of assent.

There are two types of these letters, an "A" letter of assent and a "B" letter. An "A" letter is available to contractors operating in Cook County on a permanent basis and is valid for an indefinite period, while a "B" letter is available to contractors temporarily working in Cook County and is only valid for a specified period.[8]

In August, 1975, Genser was awarded contracts on two more jobs in Cook County, one at a shoe store in the Plaza Verde shopping center and one for the Casual Corner Store at the North Riverside Mall.[9] His original "B" letter having expired, Genser and his foreman met with Van Wetering.

What transpired at this second meeting is disputed. Genser alleges that he informed Van Wetering that he intended to work permanently in Cook County.[10] Genser also alleges that Van Wetering warned him about competing with ECAC firms or else he would "never know what hit [him]."[11]

Genser later bid on, and was awarded the contract for, two other Capitol jobs at North Riverside Mall, plus another subcontract with a different general contractor, Tavaglione Construction Company. In all, then, plaintiffs were working on four jobs at the Mall.

In late August, 1975, the Gensers began work on the Casual Corner Store. It is undisputed that the job quickly fell behind schedule. The parties have each blamed the other for this turn of events. The Gensers claim that Capitol failed to provide walls and floors on schedule, to properly coordinate and supervise the work at the store, or to supply adequate blueprints. Capitol, in its turn, claims that the Gensers undermanned the job.

Genser alleges that when he first began work at North Riverside Mall, he contacted Mazzone, who was the Union's business agent for that area, about hiring union

near future, I will be contracting electrical work in Cook County." From this letter, it is impossible to tell whether plaintiffs intended to work permanently in Cook County or only on an occasional basis.

5. Actually, plaintiffs spend some time enumerating their problems with IBEW local # 701 in DuPage County, the relevancy of which is questionable.

6. Genser Dep. at 115.

7. Genser Dep. at 69–70. Genser also alleges that he asked to use a man from the DuPage union and Van Wetering refused. Genser then hired a # 134 man whose work was so unsatis-

factory that Genser had to fire him and complete the job himself.

8. Soudan Dep. at 90.

9. The Casual Corner job was subcontracted from co-conspirator Capitol. Plaintiffs had previously worked for Capitol in DuPage County.

10. Genser also recalls calling Van Wetering some time in September, 1975, to inform him that he was going to stay in Cook County. Genser Dep. at 107–08.

11. Genser Dep. at 78–81.

men. Genser implies that Mazzone asked for a bribe.[12] Genser does admit that whenever he requested additional men, electricians were referred to him by the Union without delay.[13] However, plaintiffs allege that the work on the Casual Corner Store was frequently disrupted by problems with the union men, including absenteeism, insubordination, work slowdowns, theft, and harassment by Mazzone.

On approximately October 22, 1975, Phil Dillon, Vice-President of Capitol, decided to replace Genser Electric as electrical subcontractor on the Casual Corner job. In his deposition, Dillon testified that after he had decided to replace Genser Electric, he contacted Mazzone to find out what he should do with regards to the Union. Dillon asserts this was the first time he ever spoke with Mazzone.[14] Mazzone purportedly told Dillon that it would be necessary for Capitol to obtain a release from Genser Electric.

On October 23 and 24, Dillon asked Genser's supervisors to obtain permission from the Union to work overtime on the weekend of October 25–26. Permission was denied.[15]

On the morning of October 25, 1975, Dillon and Michael Beary of New United agreed that New United would take over the Casual Corner job from Genser Electric, provided Genser agreed to execute a release.[16] Genser then arrived and a handwritten release was executed by Genser and Dillon. Later that day, Dillon and Beary met with Mazzone. Two things transpired at this meeting: Mazzone told Dillon the release had to be notarized, and he denied Dillons' request to work overtime.[17]

Dillon met again with Genser and executed new documents, which were notarized. Dillon then made two more phone calls to Mazzone in an attempt to get overtime permission for Sunday, October 26. Mazzone again refused to authorize the overtime, but he told Dillon he would not be at North Riverside Mall on Sunday to stop it, either.[18] Dillon then instructed New United to work on Sunday, and New United did in fact work that day. On Tuesday, October 28, Dillon replaced Genser Electric with New United on the other two projects at North Riverside Mall.

Plaintiffs allege that Capitol never paid in full for the work done on the North Riverside Mall jobs, or for work done on other projects plaintiffs performed for Capitol.[19] By way of contrast with the Capitol jobs, the Gensers allege that the Tavaglione job was finished and paid for without incident.

Genser alleges that he called Robert Brooks, Executive Vice President and Secretary of ECAC, the week following the execution of the releases to ask his assistance regarding the events at North Riverside Mall and to tell him of the attempted shakedown by the Union business agents.[20] Genser claims that Brooks advised him to contact the DuPage Chapter of the National Electrical Contractors Association, be-

12. Genser Dep. at 118, 252.

13. Genser Dep. at 119.

14. Dillon Dep. at 38. It is not clear whether Michael Beary of New United introduced Dillon to Mazzone or merely pointed him out, or whether Dillon introduced himself to Mazzone.

15. The Principal Agreement requires that overtime permission be obtained from the Union.

16. Beary Dep. at 59–61; Dillon Dep. at 38–42. Dillon states that he chose New United because of their performance on other projects. At this time, New United had approximately thirteen contracts with Capitol. New United's Memo in Support at 2.

The Gensers counter that New United was given the job because Beary said he had the manpower. The Gensers argue that this was only because New United unlawfully "borrowed" men from other ECAC firms. Assuming this is true, the Gensers do not claim that they lacked manpower, rather, they claim they lacked time in which to finish the job. Genser admitted, moreover, that even working overtime, he could not have finished the job by the scheduled completion date. Genser Dep. at 210, 303.

17. Dillon Dep. at 54–56.

18. Dillon Dep. at 61.

19. In fact, plaintiffs apparently sued Capitol to recover the money claimed in State court.

20. Genser Dep. at 400.

cause he was not a member of ECAC and was a member of the DuPage Chapter.[21]

On November 14, 1975, plaintiffs sent a letter to the Electrical Insurance Trustees stating that they were withholding the benefit contribution for October, 1975. Withholding of benefits is a violation of the Principal Agreement. The Electrical Joint Arbitration Board directed Genser to appear before the Board to discuss his violation.

Genser did so, and tried to set forth his complaint. He was told that the Board could only discuss his withholding of benefits and that if he wanted to bring charges, he would have to do so pursuant to established grievance procedures.[22]

On November 26, 1975, Genser sent a letter listing several charges against Van Wetering and Mazzone to the Union's Executive Board and to ECAC. In this letter, Genser stated:

"The above charges are not made to specific articles of the I.B.E.W. agreement. Whether articles of the agreement cover any or all of these charges could best be determined by persons more familiar with the provisions than myself."

On December 4, 1975, John McLaughlin, President of ECAC, responded to Genser's letter, stating: "Please be advised that we do not consider the stated charges to be related to the terms and conditions contained in the collective bargaining agreement . . . ." Robert Wilke, Chairman of the Union's Executive Board, replied to Genser's letter on December 2, 1975, stating: "In view of the nature of your letters we believe the matter should be resolved between you and our Local Union. Therefore, we request that you advise of a date and time that you can meet with our Exec-

utive Board so that these charges can be resolved."

Genser and Wilke then exchanged several more letters in an attempt to set up a meeting with Genser and the Executive Board. Genser was told that the Executive Board met regularly every Monday from 4:00 until 8:00 p. m. in downtown Chicago. Genser, however, insisted that the meeting take place in his office in a suburb of Chicago. Apparently, the meeting never took place.[23]

The foregoing are the relevant allegations made by plaintiffs about the occurrences underlying their complaint. Plaintiffs argue that these allegations are sufficient to raise a question whether a conspiracy in violation of the antitrust laws existed.

*The Principal Agreement*

▪ Initially, plaintiffs argue that the mere existence of the Principal Agreement, the collective bargaining agreement between the Union and ECAC, with that document's provisions for Letters of Assent and Joint Committees, is "sufficient . . . evidence to establish a question of improper and unlawful conduct to go to the trier of facts."[24] The court rejects this argument.

▪ A collective bargaining agreement between a union and an employer, or even a multi-employer association, is covered by the non-statutory labor exemption set forth in *Local Union No. 189, Amalgamated Meat Cutters and Butcher Workmen of North America v. Jewel Tea Co.*, 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965). The *Jewel Tea* exemption embraces union—non-labor agreements relating to wages, hours and working conditions, arrived at through bona fide, arm's-length bargaining. 381 U.S. at 689–90, 85 S.Ct. at 1601–02. The

21. Genser Dep. at 398–401.

22. Genser Dep. at 359.

23. In their Memorandum in Opposition, plaintiffs give two reasons for Genser's refusal to appear before the Union's Executive Board: "The number of threats [Genser] was receiving at this time had increased in volume and intensity, and [he] had no desire to aid anyone in fulfilling any of these threats. Addi-

tionally, the Executive Board of IBEW Local #134 was not the proper entity to hear and act on these charges." Memo in Opposition at 18 n.3. Plaintiffs do not substantiate either of these reasons with any reference to deposition testimony or documents produced during discovery.

24. Plaintiffs' Memo in Opposition at 63–64.

existence of the Principal Agreement, in and of itself, does not violate the antitrust laws. *See, e. g., California Dump Truck Owners Association, Inc. v. Associated General Contractors of America*, 562 F.2d 607, 611 (9th Cir. 1977). ("An antitrust action based upon [a collective bargaining agreement] alone does not state a claim upon which relief can be granted.") Plaintiffs cannot rely on the fact of the Principal Agreement to establish the existence of a conspiracy.

Plaintiffs single out several of the provisions of the Principal Agreement as indicating an unlawful agreement. The challenged provisions are those pertaining to the Seniority System, the Joint Arbitration Board, apprentices, and overtime. All of these provisions relate to wages, hours and working conditions, all advance legitimate labor objectives, and all are covered by the *Jewel Tea* exemption. Again, the mere fact that the Union agreed with employers regarding these topics does not indicate the existence of a conspiracy.

### The Practice of "Borrowing"

Plaintiffs argue that the manner of carrying out these provisions and other "conduct extraneous to the Principal Agreement" suggests the existence of an unlawful combination.[25] As one example, plaintiffs point to the practice of "borrowing."

The Seniority System is basically a "hiring hall." When an electrical contractor who is a party to the Principal Agreement wishes to hire an additional electrician, he applies to the System and the electrician with the greatest seniority is referred to him. Such a System fills the legitimate labor objective of providing job security in a labor market that is both highly mobile and subject to underemployment.

Plaintiffs contend that when ECAC firms need extra men, they "borrow" electricians of known ability from other ECAC firms, rather than chance an "unknown quantity"

from the System as plaintiffs were obliged to do. There is deposition testimony that the practice of "borrowing" was widespread, but there is also testimony that this practice violated the Principal Agreement and was not condoned by the Union.[26] The mere existence of such a practice is insufficient to establish any conspiracy between the Union and certain contractors.

### The Joint Arbitration Board

Plaintiffs argue that the Joint Arbitration Board, which is made up of members of both the Union and ECAC to hear disputes relating to the Principal Agreement, indicates that a conspiracy exists. Plaintiffs contend that the Board runs the Seniority System and the apprentice program and that this gives the Board the *power* to discriminate against "traveling" contractors[27], and that the Board refused to act on plaintiffs' complaint.

The first allegation, that the Board has the power to discriminate, absent any allegation of actual discrimination, is analogous to the "opportunity to conspire" discussed by the Seventh Circuit in *Weit v. Continental Illinois National Bank & Trust Co.*, 641 F.2d 457 (7th Cir. 1981). In *Weit*, the court stated that the mere opportunity to conspire lacked significant probative value. Similarly, the mere "power to discriminate," absent any showing that the Board in fact discriminated, lacks significant probative value.

Plaintiffs maintain that the Board did in fact discriminate in two ways: denying apprentices to "B" letter contractors, and in refusing to hear plaintiffs' grievances. Neither of these arguments has merit.

The Principal Agreement delegates responsibility for the training of apprentices to a joint committee composed of members of the Union and ECAC. Plaintiffs contend that this committee had a policy of not permitting apprentices to work for "B" letter contractors, but the testimony was that

---

25. Plaintiffs' Memo in Opposition at 64.

26. Soudan Dep. at 16.

27. Plaintiffs' Memo in Opposition at 65–66. By traveling contractors, plaintiffs apparently mean "B" letter contractors.

it was the Union's policy not to permit apprentices to work for "B" letter contractors.[28] If it was the Union's policy, then it was a unilateral decision.

Assuming that it was a joint policy, the decision to limit apprentices to ECAC firms and "A" letter contractors would be covered by the *Jewel Tea* exemption, because training programs are a mandatory bargaining subject. *Flambeau Plastics Corp. v. NLRB*, 401 F.2d 128, 134 (7th Cir. 1968), *cert. denied*, 393 U.S. 1019, 89 S.Ct. 625, 21 L.Ed.2d 563 (1969). The Union certainly has an interest in providing continuity during the apprentice's training period, which extends over a period of several years, and assigning an apprentice to a "B" letter contractor, who is only temporarily in the jurisdiction, would frustrate that interest.

With regard to their grievance, the undisputed facts do not support plaintiffs' argument that the Board "refused" to hear their complaint. After Robert Brooks, an officer of ECAC, referred the Gensers to the DuPage Chapter of the National Electrical Contractors Association[29], plaintiffs informed the Electrical Insurance Trustees that they were withholding benefit contributions, which is a violation of the Principal Agreement. The Joint Arbitration Board is charged with policing violations of the Agreement. Wayne Genser appeared before the Board and attempted to present his grievances with the Union but was informed that the only matter before the Board was his refusal to pay contributions.

After that, Genser sent copies of a letter listing his charges to the Union's Executive Board and ECAC. Both of these responded, indicating that the proper forum for plaintiffs to air their grievances was before the Union's Executive Board. The Gensers, however, refused to appear before the Union's Executive Board, allegedly due to fear of reprisals. In light of these uncontested facts, plaintiffs cannot argue that the Joint Arbitration Board wrongfully refused to hear their complaint.

*Refusal of Overtime Permission*

The Principal Agreement provides for a 32-hour work-week. Any contractor wishing to work his men overtime must obtain prior permission from the Union. This serves the legitimate Union objective of providing maximum employment in a labor market plagued by underemployment. Plaintiffs do not quarrel with the 32-hour week, but they do assert that the Union discriminates against "B" letter contractors and in favor of ECAC and "A" letter firms in granting permission for overtime.

To support their discrimination argument, plaintiffs allege that the Union, through Mazzone, refused to give them permission to work overtime on the weekend of October 25–26, 1975, while allowing other firms to do so, and that this resulted in plaintiffs' loss of the Casual Corner job.[30] Taking the facts in the light most favorable to plaintiffs, on at least two occasions plaintiffs or their foremen asked for overtime permission for the weekend on the Casual Corner job and Mazzone denied these requests, although the Gensers' request to work overtime on the Tavaglione job for the same weekend was granted.[31] After Capitol's Dillon had replaced the Gensers with New United, he asked Mazzone for permission to work the Casual Corner job on overtime. Mazzone refused, but said, in effect, that he would not enforce the rule. Consequently, New United men worked overtime on Sunday without Union permission.[32]

Assuming arguendo that Mazzone denied permission to the Gensers while overlooking New United's lack of permission, this does

---

**28.** Soudan Dep. at 29–31.

**29.** ECAC is the Chicago chapter of the same organization.

**30.** However, Wayne Genser stated that even if his employees had worked overtime that weekend he doubted if he could have completed the job on time. Genser Dep. at 210, 303.

**31.** Holecek Dep. at 56.

**32.** Mike Beary of New United testified that it was his understanding that he only needed to notify the union when he was going to work overtime, but that he did not need union permission. Beary Dep. at 25–26, 68–69.

not support an inference that Mazzone conspired with Capitol or New United to force the Gensers out of business. The timing of the sequence of events negates any inference of a conspiracy. Dillon of Capitol decided to replace the Gensers prior to his first meeting with Beary or Mazzone.[33] Thus it is evident that the Gensers had already lost the job before any agreement between Capitol, New United and the Union was reached.

Concededly, Mazzone's denial of permission to the Gensers for overtime on the Casual Corner store, while granting it on another job at the same site, appears arbitrary. But such arbitrariness does not indicate that a conspiracy existed between the Union and ECAC and "A" letter firms against "B" letter contractors, as plaintiffs argue. Mazzone's conduct, again, can only be held to be a unilateral act by the Union through one of its agents.

*Plaintiffs' List of Antitrust Violations*

■ In addition to their charges under the Principal Agreement, plaintiffs have compiled a list of acts allegedly constituting antitrust violations.[34] These acts are as follows:

- refusal to recognize plaintiffs as Cook County contractors;
- restrictions placed on plaintiffs by Union business agents;
- restrictions placed on traveling contractors;
- maintenance of a fair list;
- dual capacity of Hogan;
- inferior workmanship by Union journeymen;
- cooperative efforts between the Union and ECAC;

- replacement of plaintiffs with New United;
- withholding of payments by Capitol; and
- refusal of overtime permission.

None of these allegations support plaintiffs' theory of an unlawful combination between Capitol, New United, ECAC and the Union.

*Refusal to Recognize*

The Gensers allege that both the Union and ECAC refused to recognize them as "Cook County Contractors."[35] As to the Union, plaintiffs base this charge on the issuance of a "B" letter of assent, rather than an "A" letter.[36] The issuance of a letter of assent is a unilateral act by the Union. ECAC did not participate in the Union's decision to issue the Gensers a "B" letter. Assuming arguendo that plaintiffs were entitled to and wrongfully denied an "A" letter, this does not establish any agreement between the Union and ECAC.

As to ECAC, it appears that Wayne Genser never made an attempt to gain membership in that organization.[37] As plaintiffs did not apply for recognition, ECAC did not refuse to recognize them.

*Restrictions Placed on Plaintiffs by the Union Agents*

By this charge, plaintiffs appear to be complaining of the limitations resulting from the "B" letter of assent. Plaintiffs complain that their non-Local # 134 foreman was prohibited from working with the tools, and later, that he was forbidden to give orders to the Local # 134 men. Again, assuming arguendo that these restrictions were improper, this only demonstrates misconduct by the Union and does not indicate any conspiracy.

---

**33.** Dillon Dep. at 30.

**34.** Plaintiffs' Memo in Opposition at 58–59.

**35.** This term is somewhat ambiguous. Defendants argue that it was created by plaintiffs and is meaningless. Apparently, plaintiffs define a "Cook County Contractor" either as one who is a member of ECAC or holds an "A" letter of assent, or as one who is *entitled* to be an ECAC member or hold an "A" letter. However, the Union's Business Manager testified that con-

tractors with principal offices outside of Cook County held "A" letters. Soudan Dep. at 92.

**36.** An "A" letter is issued to a contractor who is determined to be working permanently in Cook County. A "B" letter is issued to a contractor temporarily working in the county. The Union determines whether a contractor is temporary or permanent. Soudan Dep. at 28–29, 90.

**37.** Genser Dep. at 397–400.

*Restrictions Placed on Traveling Contractors*

Plaintiffs allege that the mere existence of two different categories of letters of assent is per se discriminatory. Plaintiffs further allege that the issuance of a "B" letter discriminates against certain contractors because "B" letter firms are prevented from having apprentices and from being included on the Union's contractors list (the so-called "fair list").[38]

The Union has offered justifications for both these prohibitions. Because "B" letter firms are only temporarily operating in Cook County, it is contrary to the Union's interests to allow them to participate in a training program that lasts for several years.[39] Similarly, the list purports to include all contractors located in Cook County and is revised at infrequent intervals.[40] To include contractors who only work in the county for a short period of time would require frequent revisions.

Assuming arguendo that "B" letters are discriminatory, plaintiffs have again failed to allege any facts indicating that the use of "B" letters is anything other than a unilateral act by the Union. Conduct by the Union alone does not establish an antitrust conspiracy.

*Fair List*

Plaintiffs assert the maintenance of a so-called "fair list," by which they apparently mean a list of favored employers. The Union's list of contractors does not include firms with "B" letters of assent. As with the refusal to issue an "A" letter, this is chargeable only to the Union. Though the use of a fair list may be an unfair labor practice, it does not support the existence of a conspiracy.[41]

*Hogan's Dual Position*

Plaintiffs allege a conflict of interest arising from William Hogan's dual position as President of Local # 134 and Chief Electrical Inspector for the City of Chicago. As Chief Electrical Inspector, plaintiffs charge, Hogan is responsible for licensing "supervising electricians" and thereby controlling the right to do business in Chicago. Assuming arguendo that this dual position is somehow improper, this does not establish any conspiracy between the Union and either ECAC, Capitol or New United. Moreover, there are no allegations that Hogan has misused his dual position. Plaintiffs merely argue that he could.

*Inferior Workmanship*

Plaintiffs assert that the work on the Casual Corner store was frequently disrupted by the men hired from Local # 134. They offer testimony indicating problems with absenteeism, work slowdowns and theft. They also allege that defendant Mazzone, the Union's business agent, came to the site and caused problems on several occasions. Assuming all these charges are true, they only show misconduct by the Union, they do not indicate any conspiracy between the Union and others.

*Cooperation between ECAC and the Union*

Plaintiffs allege the existence of a so-called "sweetheart arrangement" between the Union and the ECAC firms and that this arrangement constitutes an antitrust conspiracy. As an example of this "sweetheart arrangement," plaintiffs point to the Joint Arbitration Board, the apprentice program, and the practice of borrowing. As explained at pp. 1160–1161, *supra,* these charges fail to support plaintiffs' conspiracy theory.

In a supplemental brief, plaintiffs for the first time allege that the obligation of all signatories to the Principal Agreement to pay a fixed percentage of their gross labor payroll to the Electrical Industry Study

---

**38.** Plaintiffs also argue that the "B" letter is discriminatory because a "B" letter firm may only bring in one non-Union man who is not allowed to work with the tools. But as "A" letter and ECAC firms may not use any non-Union men, it is difficult to understand how "B" letter firms are prejudiced.

**39.** Soudan Dep. at 103–104.

**40.** Soudan Dep. at 94–95.

**41.** Cf. *Joliet Contractors Association v. NLRB,* 193 F.2d 833 (7th Cir. 1952) (use of fair list in union boycott).

Fund violates Section 1 of the Sherman Act, relying on *National Contractors Association v. NECA*, 498 F.Supp. 510 (D.Md. 1980). The situation here is not, however, like that in the Maryland case. There, the district court found a per se violation because the mandatory contribution at issue financed NECA, which is a multi-employer association. Consequently, a non-NECA contractor was forced to support an organization made up solely of his competitors.

Here, the purpose of the mandatory contribution is to support research in the industry and to open up new markets, benefiting all employers, as well as their employees. Plaintiffs do not allege that their contribution subsidized ECAC. Thus the mandatory contribution to the EISF does not violate the antitrust laws.

### Replacement By New United

Plaintiffs argue that Capitol's decision to replace the Gensers with New United indicates that there is a conspiracy. The sequence of events is as follows.

Plaintiffs admit that on October 21 or 22, 1975, Phil Dillon, Capitol's Vice-President, contacted several electrical contractors for the purpose of acquiring bids on the completion of work in progress by Genser Electrical Contractors.[42] Dillon's uncontradicted testimony is that *after* he decided to replace the Gensers, he spoke with Mazzone, the Union's business agent, for the first time.[43] On the morning of Saturday, October 25, Mike Beary of New United agreed to take over the Casual Corner job, if the Gensers would execute a release, which they did later that morning.

Plaintiffs have not come forward with any testimony to rebut Dillon's contention that he contacted the Union agent after he had decided to replace the Gensers. That decision was an independent, unilateral act by Phil Dillon and does not indicate that there was a conspiracy.

42. Plaintiffs' Memo in Support at 12.

43. Dillon Dep. at 30, 33.

44. Plaintiffs themselves seem to acknowledge that Capitol's refusal to pay was a unilateral act. In a footnote in their responsive brief,

### Withholding of Payments

Plaintiffs complain that Capitol has withheld payments due them for work done on the North Riverside jobs, as well as on other jobs in other counties. Plaintiffs make no allegations that support any inference that Capitol did so in collusion with the Union or New United.[44]

### Refusal of Overtime Permission

As discussed at pp. 1161–1162, *supra,* Mazzone's refusal to give the Gensers permission for overtime was a unilateral act by one of the Union's agents.

### Plaintiff's Hearsay Allegations

A word must be said about Wayne Genser's allegations regarding certain threats made by Van Wetering. On a motion for summary judgment, the court may only consider such evidence as would be admissible at trial. These hearsay allegations do not appear admissible and plaintiffs cannot rely on inadmissible evidence to defeat a motion for summary judgment.

### Conclusion

Plaintiffs' allegations, liberally construed, reveal a history of difficulties with the Union and with their general contractor, Capitol. But their allegations do not support their theory of a conspiracy between the Union, ECAC, New United and Capitol. Absent any such conspiracy, plaintiffs may not seek to redress their wrongs by means of an antitrust action.

Most of plaintiffs' alleged antitrust violations are unilateral acts of the Union or its agents: the issuance of the "B" letter, the fair list, Hogan's dual position, the inferior workmanship, the refusal of overtime. Other challenged conduct is the unilateral conduct of Capitol: the decision to replace the Gensers and the withholding of payments.

they argue that even if Capitol acted independently, its conduct still violated the Sherman Act. Memo in Opposition at 33. In the absence of a conspiracy, Capitol's independent acts are irrelevant to this lawsuit, as Capitol is not a defendant.

Plaintiffs have attempted to establish an industry-wide conspiracy aimed at all holders of "B" letters of assent, but after extensive discovery, they have failed to show that any such conspiracy exists. The distinction between an "A" letter and a "B" letter is rationally based on the difference between permanently and temporarily working in Cook County. The three differences in treatment that result from a "B" letter—no apprentice, one non-union man, not on the contractors list—all flow from the fact that "B" letter firms are only temporarily in the county. Moreover, all the differences in treatment originate, as does the "B" letter itself, from unilateral decisions by the Union.

Plaintiffs' complaint is actually that they were issued a "B" letter when they felt they were entitled to an "A" letter. This is a dispute between plaintiffs and the Union, and does not indicate any conspiracy. Similarly, they complain of threats and attempted "shakedowns" by Union officials. These allegations may constitute unfair labor practices, but they do not support the existence of a conspiracy.

Because plaintiffs have not alleged or established that any of the defendants possess the requisite monopoly power or dangerous probability of monopoly power in the electrical contracting industry, their monopolization claims must be dismissed. Defendants' motions for summary judgment on Count I are granted because plaintiffs have failed to allege facts from which the existence of a conspiracy could be inferred. The federal claims in Count I having been dismissed, the pendent state claims in Counts II and III are also dismissed.