**RENO HILTON RESORTS, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**International Union, United Plant Guard Workers of America, Intervenor.**

**No. 98–1484.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 7, 1999.

Decided Dec. 3, 1999.

Joseph E. Herman argued the cause and filed the briefs for petitioner.

Steven B. Goldstein, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were Linda Sher, Associate General Counsel, John D. Burgoyne, Acting Deputy Associate General Counsel, and David Habenstreit, Supervisory Attorney.

Scott A. Brooks argued the cause and filed the brief for intervenor.

Before: GINSBURG, ROGERS and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROGERS.

ROGERS, Circuit Judge:

Reno Hilton Resorts ("Reno Hilton") appeals the decision and order of the National Labor Relations Board ("Board") that it had violated §§ 8(a)(1) and (3) of the National Labor Relations Act ("Act"), 29 U.S.C. §§ 158(a)(1) and (3), by contracting out the work of its recently unionized security service. *See Reno Hilton Resorts*, 326 NLRB No. 154, 1998 WL 723981, at *1 (Sept. 30, 1998). Reno Hilton contends that the Board misstated and misapplied the appropriate legal standard for determining whether an employer's discharge of an employee constitutes an unfair labor practice, and lacked substantial evidence to support its finding of discriminatory intent. Finding these contentions unpersuasive, we deny the petition for review and grant the Board's cross-application for enforcement of the order.

## I.

When Reno Hilton began operating what was formerly a Bally's hotel-restaurant-casino complex in 1992, it inherited Bally's security staff, the members of which were not represented by any labor organization. Shortly thereafter, while implementing a cost-savings plan, Reno Hilton considered and rejected various proposals to contract out a number of security positions, despite a projected annual savings ranging from $24,000 to $96,000.

In June 1993, International Union, United Plant Guard Workers of America ("Union") began a campaign to organize Reno Hilton's security employees. After losing an election by a vote of 51 to 34, the Union filed unfair labor practice charges with the Board. While those charges were pending,[1] the Union started another campaign in 1995 to organize Reno Hilton's security employees, and an election was scheduled for September 1995. Reno Hilton retained a labor consulting firm, The Burk Group, to assist it in its opposition to the union campaign, as it had done in the first campaign. Shortly before the election, Gary Parillo, an "anti-union" security employee, was called into the office of Reno Hilton's director of security, Dave Bennett, to meet with a Burk Group official. A color-coded chart in the office listed various security department employees and their position on the Union's organizing efforts. The Burk Group official asked Parillo to help determine which security employees were pro- or anti-union, advising Parillo that if the Union came in, the hotel would contract out the security jobs and showing Parillo figures purporting to represent the associated cost savings.

---

1. After finding in another proceeding that Reno Hilton had violated sections 8(a)(3) and (1) of the Act, an administrative law judge recommended that the 1993 election be set aside. *See Reno Hilton*, Nos. 32–CA–13618, 32–RC–3777 (Aug. 18, 1994). The Board substantially affirmed the decision of the ALJ. *See Reno Hilton Resorts*, 320 NLRB 197, 197 n. 4, 211 (1995).

The Union won the election by a vote of 44 to 33 and was certified by the Board on October 12, 1995, as the exclusive collective-bargaining representative of the full-time and regular part-time security employees at the Reno Hilton. Shortly before and after the election, Reno Hilton's management indicated to rank-and-file employees that the presence of the Union would mean that "things would get really rough." Within two weeks of the Union's certification, the Hilton Hotel's Vice President, Jim Anderson, met with Bennett regarding contracting out Reno Hilton's security work. According to Lee Boekhout, a Reno Hilton security employee, Bennett's impression after that meeting was that Reno Hilton "may have lost the battle," but it had "won the war," and that "they [i.e., the unit security employees] were gone." Bennett reassured Boekhout, however, that his job was protected because, Bennett claimed, he was able to save the jobs of the ten or eleven employees who supported Reno Hilton's position in the election campaign.

During contract negotiation sessions from November 1995 to early August 1996, Anderson continually proposed to the Union that Reno Hilton would have the right to contract out its security work. The Union presented counter proposals to the subcontracting plans, which Reno Hilton rejected. According to the Union President, Anderson assured the Union negotiators that Reno Hilton had no present intention to contract out its security work. Be that as it may, in February 1996, Bennett sent a memorandum to Reno Hilton's president advising that his investigation with two potential subcontractors of the costs of bringing in an outside security service indicated that Reno Hilton could save a considerable amount of money. In April 1996, several high-ranking Hilton Corporation and Reno Hilton officials discussed the economics of contracting out the security work. During this time the administrative assistant to Reno Hilton's

director of security, and its director of human resources spoke to Boekhout about changing the job titles of anti-Union employees to protect their jobs from the imminent elimination in the wake of contracting out.

Then, in June 1996, Reno Hilton presented the Union with a proposed wage freeze and an unrestricted right to contract out. When the Union rejected the proposal, Reno Hilton responded with a proposal for a three-year contract with a wage ceiling of $10.43 and a one-year bar on contracting out security work. The Union rejected this proposal as well as a third proposal for no wage adjustment and unrestricted rights to contract out. The security employees went on strike. The strike lasted from the end of July 1996 until mid-August 1996, at which point Reno Hilton and the Union entered into a collective bargaining agreement. The agreement froze wages, prohibited discrimination against employees on the basis of union or non-union status, and provided that Reno Hilton had the right to "[c]ontract or subcontract any work."

In October 1996, Reno Hilton conducted a financial impact analysis of contracting out that estimated savings of over $1.5 million over three years. On November 1, 1996, hotel officials met with a potential subcontractor, American Protective Services, to discuss cost and quality issues. The same day, Anderson wrote to the Union President requesting a meeting to discuss the results of the hotel's inquiry into contracting out. Prior to the meeting, Anderson informed the Union that contracting out security work at the available base wage rate of $7.50 per hour would save Reno Hilton $4.23 per hour per employee. Also, prior to the meeting, hotel officials made the decision to contract out its security work in January 1997, unless the Union would agree to a wage cut equal to the projected cost savings of contracting out.[2] Reno Hilton's financial statement

---

**2.** In January 1997, Reno Hilton discharged     all of the security bargaining unit employees

purported to show a decline of $10,587,156 in net revenues in 1996 from the prior year.

Before the contracting out decision was implemented in January 1997, Reno Hilton made two offers to the Union to avoid subcontracting. At the meeting with the Union President in late November 1996, Anderson stated first, that Reno Hilton would save over $500,000 annually by contracting out the security work of rank-and-file employees; second that the Union counter-proposals projecting over $400,000 annual savings were unacceptable; and third, that if the Union wanted to avoid contracting out, it would have to agree to a base wage rate for Reno Hilton's security staff of $7.75 per hour, which included the $0.25 per hour profit margin it would have to pay the subcontractor. In response to the Union's protest that the proposed wage decrease was an attempt to drive it out, inasmuch as Reno Hilton had not tried to lower wages in this manner during the contract negotiations, Anderson claimed that the cost saving benefits of contracting out had only recently become apparent. The Union rejected this avoidance offer.

Another avoidance offer was made the following month. In early December 1996, Reno Hilton informed the Union that the hotel would contract out its security work in January 1997. On December 20, 1996, the Union filed unfair labor practice charges on the ground that the company contracted out its security work in retaliation for the employees' union activity while protecting the jobs of "loyal" employees. At an eleventh hour meeting before Reno Hilton contracted out, Anderson reiterated the $7.75 offer, informing the Union that no amount of cost savings proposed by the Union would substitute for accepting that

wage rate. Reno Hilton also proposed to make severance pay contingent upon the employees' agreeing not to sue Reno Hilton. The Union rejected the offer.

In response to the Union's December 1996 charges, the ALJ ruled that Reno Hilton had violated §§ 8(a)(3) and (1) of the Act by contracting out its security employees' work and dismissing all of its security employees, and recommended immediate and full reinstatement of the employees with back pay and benefits. The Board affirmed substantially all of the ALJ's rulings, findings, and conclusions, and expanded the remedies to include a broader cease-and-desist order,[3] rescission of the subcontract with American Protective Services, and restoration of the *status quo ante* by ordering Hilton to re-establish an in-house security force. Reno Hilton petitioned the court for review under 29 U.S.C. § 160(f), and the Board cross-petitioned for enforcement of its order under § 160(e).

## II.

Under § 8(a)(3) of the Act, it is an unfair labor practice for an employer "to encourage or discourage membership in any labor organization," "by discrimination in regard to hire or tenure of employment or any term or condition of employment." 29 U.S.C. § 158(a)(3). Such conduct also would violate § 8(a)(1) because it "interfere[s] with, restrain[s], or coerce[s] employees in the exercise of" their labor rights. 29 U.S.C. § 158(a)(1); see *Power Inc. v. NLRB*, 40 F.3d 409, 417 n. 3 (D.C.Cir.1994). An employer violates §§ 8(a)(3) and (1) if it takes adverse action against an employee because of the protected union activity. *See* 29 U.S.C.

and contracted out their work to American Protective Services, which has supplied Reno Hilton the same number of full-time security officers as those utilized prior to the contracting out. Approximately thirteen of Reno Hilton's former security employees obtained employment with American Protective Services.

3. The amended order provided for the expungement from the employment records of the terminated security employees all references to the unlawful discharge, and required Reno Hilton to produce employment records necessary to calculate back pay due to the terminated employees.

§§ 158(a)(3), (1); *LCF, Inc. v. NLRB*, 129 F.3d 1276, 1281 (D.C.Cir.1997).

■ At the outset, Reno Hilton maintains that the General Counsel's decision not to pursue a § 8(a)(5) charge against the hotel for bad faith in bargaining for the contracting out clause precludes an unfair labor practice claim under § 8(a)(3) for exercising its rights under that clause. We disagree. A decision not to prosecute is made for many reasons, sometimes for reasons unrelated to the merits of the charge. *See, e.g., Heckler v. Chaney*, 470 U.S. 821, 831, 105 S.Ct. 1649, 1655–56, 84 L.Ed.2d 714 (1985). Reno Hilton offers nothing to show that the General Counsel's decision was based on an affirmative finding of good faith by Reno Hilton in all its actions under the parties' agreement. Even assuming the General Counsel's exercise of its prosecutorial discretion could support an inference that the hotel had bargained for the contracting out clause in good faith, Reno Hilton proffers no persuasive authority for the proposition that such an inference precludes a § 8(a)(3) violation for discrimination in the exercise of rights under the bargained-for contracting out provision.

■ In contending that its exercise of its contracting out rights under the parties' agreement cannot be deemed a § 8(a)(3) violation, Reno Hilton relies on the Sixth Circuit's decision in *"Automatic" Sprinkler Corp. of America v. NLRB*, 120 F.3d 612, 620 (6th Cir.1997), *cert. denied*, 523 U.S. 1106, 118 S.Ct. 1675, 140 L.Ed.2d 813 (1998). In that case, the court held that the employer's exercise of its contractual right to subcontract did not constitute a violation of § 8(a)(3). But as the dissenting judge noted, the majority did not address the findings of the ALJ as adopted by the Board that the employer's conduct was motivated by anti-union animus. *See id.* at 622 (Ryan, J., dissenting). Further, the decision in *Automatic Sprinkler*, which has not yet been cited with approval outside of the Sixth Circuit, is at odds with the general principle that a party cannot exercise its contractual rights in violation of the law. Thus, the Tenth Circuit in *Capitol Steel & Iron Co. v. NLRB*, 89 F.3d 692, 696–97 (10th Cir.1996), declined to countenance the calculated use of waiver clauses in a contract to undermine the collective bargaining process, affirming the Board's finding of a § 8(a)(5) violation where the employer had announced wage increases "in such a way and at such a time as to sway the employees who would immediately thereafter vote on [the employer's] 'last and final offer.'" Similarly, the Third Circuit in *NLRB v. Joy Technologies, Inc.*, 990 F.2d 104, 111 n. 7 (3d Cir.1993), noting that "contract language does not exempt the Employer from its obligation to act lawfully under the NLRA," affirmed the Board's finding that the employer had unlawfully abused the superseniority clause in the parties' contract by transferring a position so as to "ensure that Beightol would remain union committeeman and obtain the higher-paying position." So too, in *Gannett Rochester Newspapers v. NLRB*, 988 F.2d 198, 203 (D.C.Cir.1993), this circuit observed that "[u]nder the clear-and-unmistakable standard [for waiver], courts may 'not infer from a general contractual provision that the parties intended to waive a statutorily protected right unless the undertaking is explicitly stated.'" *Id.* (quoting *Metropolitan Edison Co. v. NLRB*, 460 U.S. 693, 708, 103 S.Ct. 1467, 75 L.Ed.2d 387 (1983) (internal quotation omitted)). Even when the waiver is explicit, moreover, the waiver is not read broadly. *See id.* Because the record is devoid of evidence to infer, much less show, that the Union waived its § 8(a)(3) rights by entering into the agreement with Reno Hilton, there is no basis for adopting either Reno Hilton's contention or the Sixth Circuit's analysis in *Automatic Sprinkler*.

### III.

Consequently, the heart of Reno Hilton's appeal turns out to be its contention that the Board lacked substantial evidence of

anti-union animus to find a violation of §§ 8(a)(3) and (1). First, it maintains that the General Counsel did not establish a violation of the Act under *Wright Line*,[4] because the ALJ misstated the test, gave controlling weight to evidence outside the § 10(b) period, failed to consider changed circumstances prompting the contracting out decision, and made inappropriate comparisons between Reno Hilton and other Hilton hotels. Second, Reno Hilton maintains that it rebutted any evidence of anti-union animus by establishing that its decision to contract out was driven by economic considerations, and that the ALJ erred by not considering such evidence and by drawing negative inferences from Reno Hilton's failure to call certain witnesses. Neither contention is persuasive.

■■■ The court will affirm the findings of the Board unless they are "unsupported by substantial evidence in the record considered as a whole," *General Elec. Co. v. NLRB*, 117 F.3d 627, 630 (D.C.Cir.1997), or unless the Board "acted arbitrarily or otherwise erred in applying established law to the facts." *Allegheny Ludlum Corp. v. NLRB*, 104 F.3d 1354, 1358 (D.C.Cir.1997) (quotation and citation omitted). The court must "take account of anything in the record that 'fairly detracts' from the weight of the evidence supporting the Board's conclusion." *General Elec.*, 117 F.3d at 630 (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464–65, 95 L.Ed. 456 (1951)). Even if the court might have reached a different conclusion had the court considered the issue de novo, the court will uphold the Board's decision if it is supported by substantial evidence in the record. *See Synergy Gas Corp. v. NLRB*, 19 F.3d 649, 651 (D.C.Cir.1994). The court gives even greater deference to the Board's determination of questions of motive, *see Laro*

*Maintenance Corp. v. NLRB*, 56 F.3d 224, 229 (D.C.Cir.1995), and "accept[s] the ALJ's credibility determinations that are adopted by the Board 'unless they are patently unsupportable.'" *Schaeff Inc. v. NLRB*, 113 F.3d 264, 266 (D.C.Cir.1997) (quoting *NLRB v. Creative Food Design Ltd.*, 852 F.2d 1295, 1297 (D.C.Cir.1988)); *see also Capital Cleaning Contractors, Inc. v. NLRB*, 147 F.3d 999, 1004 (D.C.Cir. 1998).

When examining an allegation of a § 8(a)(3) violation, the Board applies the two-stage test first articulated in *Wright Line*, under which the Board's General Counsel has the burden of persuasion to show that union activity was a substantial or motivating factor in the employer's decision to contract out. *See Wright Line*, 251 N.L.R.B. at 1089; *Southwest Merchandising Corp. v. NLRB*, 53 F.3d 1334, 1339–40 (D.C.Cir.1995); *see also Laro Maintenance Corp.*, 56 F.3d at 228. The employer, in turn, may rebut the inference by showing by a preponderance of the evidence that it would have taken the same action absent the union activity and the employer's anti-union motivation. *See Wright Line*, 251 N.L.R.B. at 1089.

■■■ Reno Hilton maintains that the ALJ misstated and misapplied the *Wright Line* test by referring to the General Counsel's initial burden as a "prima facie showing," and by failing to consider Reno Hilton's proffered economic justification or evidence of its cost savings matching offers as part of the threshold determination whether the General Counsel met its initial burden. Any misstatement or misapplication of the *Wright Line* test is immaterial, however, so long as there is substantial evidence supporting the Board's determinations that anti-union animus was a motivating factor in the employer's decision to

4. 251 N.L.R.B. 1083, *enf'd*, 662 F.2d 899 (1st Cir.1981), *cert. denied*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982), which was upheld in *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 399–403, 103 S.Ct. 2469, 2473–75, 76 L.Ed.2d 667 (1983), *overruled in part on other grounds by Director, Office of Workers' Compensation Programs, Dep't of Labor v. Greenwich Collieries*, 512 U.S. 267, 276–78, 114 S.Ct. 2251, 2257–58, 129 L.Ed.2d 221 (1994).

contract out its unit security work and that Reno Hilton failed to carry its burden of proof that it would have made the same decision regardless of such animus. *Cf. NLRB v. GATX Logistics, Inc.*, 160 F.3d 353, 357 (7th Cir.1998).

The Board relied primarily on the following factual findings by the ALJ in concluding that the General Counsel carried his burden of persuasion showing that Reno Hilton was motivated by anti-union animus when deciding to contract out its security work. First, there was the matter of timing. The contracting out decision came on the heels of heavy union activity, most notably following the strike preceding negotiation of the collective bargaining agreement. The timing of the decision to contract out is suspect in view of evidence that Reno Hilton knew long before the Union's certification that contracting out its security work could save a significant amount of money given Reno Hilton's above-market wages for its security employees. As the court pointed out in *MECO Corp. v. NLRB*, 986 F.2d 1434, 1437 (D.C.Cir.1993), timing is a telling consideration in determining whether employer action is motivated by anti-union animus. *See also General Elec.*, 117 F.3d at 638 (citing *Parsippany Hotel Management Co. v. NLRB*, 99 F.3d 413, 422 (D.C.Cir. 1996)).

Second, reasonable inferences of anti-union motivation were virtually compelled by the statements of Reno Hilton officials during the Union campaign to the effect that the hotel would strongly consider contracting out security jobs if the Union prevailed in the election.[5] Particularly compelling is the evidence of comments by security director Bennett to Boekhout regarding his post-unionization efforts to contract out the security work while preserving the jobs of the anti-union employees.[6] There was evidence as well of other discussions of job protection for anti-union employees, including a suggestion by the head of human resources at Reno Hilton that job titles could be manipulated to avoid termination of employer-allied employees due to the contracting out of all security work. Although Bennett ultimately was unable to protect jobs as he promised, the various statements by hotel officials strongly support the inference that the security employees' union activity was a substantial and motivating factor in Reno Hilton's decision to contract out its security work.

That evidence notwithstanding, Reno Hilton contends that the Board erred by failing to consider evidence at each step of analysis under *Wright Line*. Reno Hilton

5. Contrary to Reno Hilton's contention, the Board could properly consider evidence outside of the § 10(b) six-month-limitations period for purposes of illuminating the events taking place within the period. *See Sheet Metal Workers' Int'l Ass'n. AFL–CIO v. NLRB*, 989 F.2d 515, 519 (D.C.Cir.1993). The evidence of the hotel's unfair labor practices during the election was not so remote in time as to be unrelated to the hotel's decision to contract out, *see MECO Corp.*, 986 F.2d at 1437, particularly where, as here, the formulation of that decision began two weeks after the certification of the Union.

6. Boekhout's unrebutted affidavit stated in pertinent part:
On or about October 25 or 26, [1995], about a month or so after the election, I was in the security office when Director of Security Dave Bennett returned from a meeting upstairs.... He told me that they had

made a presentation to Jim Anderson and the others (he didn't name who) at the meeting concerning going to contract security and they.had bought it. He said that they had told them that they could save more than $500,000. He told me that they had said do it. He then told me that they may have lost the battle but that they had won the war. He said that they were gone. I believe I said oh, s[* * *]. Bennett told me not to worry about it, that my job was protected, that he had managed to save the 10 or 11 of us. Bennett did not actually say the word subcontracting [i.e., contracting out], but I knew what he meant. When he said "they were gone" I knew he meant the [employees in the] Union. When he referred to the 10 to 11 of us he meant those security officers who supported the Company and not the Union.

points to the evidence that on two occasions it offered to refrain from contracting out its security work if the Union would match the subcontractor's wages. The ALJ did not refer to these two avoidance offers in his decision. On a different evidentiary record, the Board might view evidence of two avoidance offers as successfully rebutting the evidence of anti-union animus. Here, however, there was evidence that Reno Hilton was engaged in a pervasive, continuing effort to undermine union organizing efforts prior to certification and afterwards, when it limited the Union's knowledge of the contracting out plans and frustrated the Union's efforts by offering an unreasonable $7.75 wage rate, which not only was below the prevailing average wage rate in the area, but represented a severe wage cut for most Reno Hilton security employees.[7] Under the circumstances, the two avoidance offers could hardly rebut the pervasive and stark evidence of anti-union animus. Because the evidence was legally irrelevant, the ALJ's failure to address it is of no moment. The relevant comparison, in analyzing the § 8(a)(3) charge that Reno Hilton discriminated against its security employees because of their protected union activity, is between the unionized security employees and their non-union predecessors. It follows, therefore, that the General Counsel satisfied the first step of the *Wright Line* test: there is substantial evidence in the record to support the Board's finding that Reno Hilton was motivated by anti-union animus when it decided to contract out its security work.

As to the second step of *Wright Line*, Reno Hilton contends that its financial statement for 1996 and other evidence established that it would have contracted out its security work absent anti-union animus. Specifically, Reno Hilton relies on evidence that the decision to subcontract was being considered prior to its security employees' union activity as part of an ongoing cost reduction plan, and was prompted, in 1996, primarily by falling revenues and profits. Reno Hilton produced evidence that it and its sister hotel, the Flamingo Hilton–Reno, had been engaged in cost-cutting programs, including closing, combining, or consolidating certain operations and laying off employees.[8] The ALJ concluded, and the Board agreed, that the evidence supporting Reno Hilton's contention that it was motivated by lawful business considerations "is sorely wanting, as not one individual who was instrumental in making such a decision was called by [Reno Hilton] as a witness in this proceeding." The Board correctly noted that the ALJ had improperly drawn adverse inferences from Reno Hilton's failure to produce testimony from relevant witnesses who were no longer in its employ at the time of the hearing. *See Reno Hilton Resorts,* 326 NLRB No. 154, 1998 WL 723981, *2 n. 1 (citing *Irwin Industries, Inc.,* 325 NLRB No. 149, 1998 WL 261141, *35 n. 12 (May 19, 1998); *Goldsmith Motors Corp.,* 310 NLRB 1279, 1280 n. 1 (1993)); *see also Property Resources Corp.,* 285 NLRB 1105, 1105 n. 2 (1987), enf'd 863 F.2d 964 (D.C.Cir.1988). But,

7. A 1995 Reno Hilton wage survey indicated that Reno Hilton's maximum wage rate of $12.62 per hour for security employees was almost three dollars higher than the $9.64 average maximum wage rate paid by nine competing hotels. Seventy percent of Reno Hilton's security employees were paid at or near the top rate.

8. No other Hilton Hotel casino has a unionized security staff, nor has any Hilton Hotel casino contracted out the work of its security force. Reno Hilton relies on evidence that it engaged in joint cost-cutting measures with

the Flamingo Hilton–Reno, yet maintains that consideration of the Flamingo Hilton–Reno's comparative treatment of its security employees is irrelevant. We decline, in any event, to draw any inference from the fact that the Flamingo Hilton–Reno, which is in the same wage market as the Reno Hilton, has not reduced the wage rates of its security staff as Reno Hilton proposed to the Union as an alternative to subcontracting because there is insufficient information in the record about Flamingo Hilton–Reno's financial condition during the relevant period.

the record also contained potentially damaging evidence from Bennett, who remained Reno Hilton's director of security and had written a crucial memorandum in February 1996 on contracting out, the only remaining copy of which was missing a key portion.[9] The absence of Bennett's testimony, therefore, represents a glaring omission in Reno Hilton's case, especially as it relates to Bennett's partially-recovered memorandum.[10]

No more availing is Reno Hilton's contention that its economic defense rebutted the evidence of anti-union motivation. In *LCF, Inc. v. NLRB*, 129 F.3d 1276 (D.C.Cir.1997), on which Reno Hilton relies, the employer presented overwhelming evidence of its grim economic situation that outweighed the inference arising from the otherwise suspect timing of its decision to contract out. *See id.* at 1282–83. By contrast, the persuasive force of Reno Hilton's evidence that falling revenues and profits in 1996 were the impetus for the contracting out decision is severely weakened by the evidence that it proposed contracting out two weeks after the Union's certification. This occurred despite the claim of Hilton's Vice President when bargaining began that it had no present intentions to contract out Reno Hilton's security work. Nor did Reno Hilton present any evidence to explain why it chose to contract out all of its security service in response to the revenue decline. It presented no testimony from any decision maker linking the decision to contract out to the revenue decline. It presented no testimony even as to when the revenue decline became apparent to management; the only testimony on the revenue decline is from Mike Caryl, who by his own testimony, was not a decision maker. Given the totality of the circumstances, the Board could find that evidence of changed circumstances in the form of a financial statement suggesting a decline in earnings fails to demonstrate that the decision to contract out was prompted by that decline.

Accordingly, because there is substantial evidence in the record to support the Board's finding of anti-union animus and its rejection of Reno Hilton's defense that the contracting out of the entire security service would have occurred for economic reasons absent anti-union animus, we deny the petition for review and grant the Board's petition for enforcement of its order.

---

9. The omitted portion of Bennett's memorandum was relevant to whether Reno Hilton had a legitimate business justification for contracting out its security service; it purported to set forth Bennett's "ideas as to why a contract security company can better service us than in-house security." Memorandum of February 26, 1996, from Bennett to the president of Reno Hilton.

10. Reno Hilton's challenge to the ALJ's refusal to reopen the administrative record is meritless. Reno Hilton sought to admit evidence that, nearly three weeks after the hearing, Reno Hilton contracted out one of its restaurant operations, resulting in the termination of 132 non-union employees. Although the ALJ did not elaborate on his ruling denying the motion to reopen the record, the court will not find an abuse of discretion unless it "clearly appear[s]" that the new evidence would compel or persuade to a contrary result." *Cooley v. FERC*, 843 F.2d 1464, 1473 (D.C.Cir.1988) (alteration in original) ,(quotation and citation omitted). The proffered evidence does not meet this standard, and hence we find no abuse of discretion. *See Thomas–Davis Medical Ctrs. v. NLRB*, 157 F.3d 909, 912 (D.C.Cir.1998) (citing *Road Sprinkler Fitters Local Union No. 669 v. NLRB*, 789 F.2d 9, 14 (D.C.Cir.1986)).