281 F.3d 442
 RGC (USA) MINERAL SANDS, INCORPORATED, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
International Association of Machinists and Aerospace Workers, Respondent-Intervenor.
National Labor Relations Board, Petitioner,
International Association of Machinists and Aerospace Workers, Petitioner-Intervenor,
v.
RGC (USA) Mineral Sands, Incorporated, Respondent.
 No. 01-1174.
 No. 01-1371.
 United States Court of Appeals, Fourth Circuit.
 Argued November 2, 2001.
 Decided February 22, 2002.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED ARGUED: Michael J. Bobroff, Bobroff, Hesse, Lindmark & Martone, P.C., St. Louis, Missouri, for RGC. Jeffrey Michael Hirsch, National Labor Relations Board, Washington, D.C., for Board. ON BRIEF: John H. Ferguson, Associate General, Aileen A. Armstrong, Deputy Associate General, Sharon I. Block, Supervisory Attorney, National Labor Relations Board, Washington, D.C., for Board. Mary Jill Hanson, Hanson, Perry & Jensen, P.A., West Palm Beach, Florida, for Machinists.
 Before MICHAEL, KING, and GREGORY, Circuit Judges.
 Petition denied in No. 01-1174, and cross-petition granted and order enforced in No. 01-1371, by published opinion. Judge MICHAEL wrote the opinion, in which Judge KING and Judge GREGORY joined.
 OPINION
 MICHAEL, Circuit Judge.
 
 
 1
 RGC (USA) Mineral Sands, Inc. (RGC) petitions for review of an order of the National Labor Relations Board. RGC challenges two principal findings of the Board: first, that the company violated §§ 8(a)(1) and (3) of the National Labor Relations Act (the Act or the NLRA) by imposing onerous shift assignments in retaliation for the employees' rejection of a shift assignment plan proposed by the company; and second, that a subsequent strike by RGC employees was motivated in part by the retaliatory shift assignments. In addition, RGC challenges the Board's conclusion that the collective bargaining agreement did not permit RGC to make shift assignments in a manner that violated the Act. We conclude (1) that the Board's findings are supported by substantial evidence and (2) that the Board properly determined that RGC could not exercise its contractual rights in violation of the Act. We therefore deny RGC's petition for review. The Board cross-petitions for enforcement of its order, and we will enforce it in full.
 
 I.
 
 2
 RGC operates a titanium mine in Green Cove Springs, Florida. The International Association of Machinists and Aerospace Workers (the union) has represented the company's production and maintenance employees since 1972. RGC's operation has three main work areas: the wet mill, which does the actual mining; the dry mill, which processes the mined material; and the front shop, which provides maintenance. Not all maintenance employees (mechanics) are assigned to the front shop. Some are assigned to the other two work areas. Although RGC operates 24 hours a day, the mechanics have traditionally worked only the day shift. In the mid 1990s RGC management decided that the lack of mechanics on the evening and night shifts (the swing shifts) was costing the company too much money. When machinery broke down during a swing shift, RGC either had to suffer the costs of lost production or pay overtime to mechanics who were called in to repair the machinery. RGC tried several scheduling plans to rotate mechanics into the swing shifts. After continuing disagreement between the mechanics and RGC over the scheduling, management finally came up with a new proposal in September 1997 under which all mechanics from all three work areas would rotate to cover the swing shifts. The proposal was presented for a vote to the entire bargaining unit, that is, production as well as maintenance employees. The employees voted down the proposal because they wanted to be able to choose their shift assignments in order of seniority.
 
 
 3
 Immediately following the vote, Graeme Sloan, RGC's general manager, instructed Marvin Short, the senior maintenance supervisor, to assign only mechanics from the front shop to cover the evening and night shifts. This meant that mechanics from the other work areas, the wet and dry mills, would not have to work the swing shifts. Short met with the front shop mechanics to announce the new shift assignments: eight mechanics from the front shop had been selected without regard to seniority to cover the swing shifts. One mechanic asked why the company had ignored seniority in making the new assignments, and another commented that it was done to punish the mechanics. Short responded to these comments by slamming a folder on the table and saying, "I'll tell you how you were picked or why you're going on [the swing shifts, it's] because [of the] bullshit that you went down there to the Union hall and started [and] the way you all voted." Short added that Sloan (the general manager) had ordered the assignments because he was "tired of your bullshit and because of the vote you took down [at] the fucking Union hall." Sloan, who was also present at the meeting, told the mechanics that they were "bloody bullies" who had "browbeat" the other employees into voting down the shift assignment proposal. After the union filed grievances in October 1997 over the swing shift assignments, RGC posted bids for the positions. No qualified mechanic bid on the positions, and in December 1997 RGC made permanent six of the original eight swing shift assignments. In January 1998 Calvin Coon, a union shop steward and one of the mechanics assigned to a swing shift, filed an unfair labor practice charge with the NLRB alleging that RGC had taken eight mechanics off straight day shift and placed them on swing shifts in retaliation for the defeat of the company's shift assignment proposal.
 
 
 4
 In the meantime, the collective bargaining agreement's expiration date, August 30, 1998, was drawing near. RGC and the union held a number of bargaining sessions in July and August in an effort to negotiate a new contract. The union argued throughout the bargaining that shift assignments should be based on seniority, but RGC would not agree. After RGC's final offer on August 23, 1998, which did not provide for seniority in shift assignments, the employees met to consider a strike. During these meetings the employees repeatedly expressed concern about the company's unwillingness to consider seniority. For example, one employee said, "if they'll do the senior mechanics the way they have, they will do anybody that way." The parties failed to reach a new agreement, and the employees went on strike when the old agreement expired at the end of August. RGC then hired 44 replacement workers, and in April 1999 all 46 striking employees offered unconditionally to return to work. RGC refused the offer, stating that it considered the strike to be economic. The union responded that the striking employees were entitled to reinstatement because they had been involved in an unfair labor practice strike.
 
 
 5
 The two charges against RGC mentioned above (relating to retaliatory shift assignments and the refusal to reinstate the strikers) as well as other charges were litigated before an administrative law judge and, ultimately, the Board. In affirming the ALJ, the Board determined that RGC violated §§ 8(a)(1) and (3) of the Act in two principal ways. First, the Board found that the company committed an unfair labor practice by assigning mechanics to more onerous shifts in retaliation for protected § 7 activities (relating to the vote rejecting the company's shift assignment proposal). Second, the Board found that the company's unlawful shift assignments were one of the causes of the subsequent strike. As a result, the Board concluded that the company violated §§ 8(a)(1) and (3) of the Act by refusing to reinstate the striking employees immediately after their unconditional offer to return to work.
 
 
 6
 The Board also adopted the ALJ's findings that RGC had engaged in a number of additional unfair labor practices. According to the Board's order, RGC did not file exceptions to the ALJ's findings that it violated § 8(a)(1) of the Act by creating an impression of surveillance of its employees' union activities, by threatening to retaliate for the union vote, by threatening an employee because he filed a safety complaint, by telling employees that it was improper to make safety complaints, by interrogating employees about their safety complaints and unfair labor practice charges, by preventing a union steward from coming onto company property to investigate potential grievances, by interviewing an employee in connection with possible disciplinary action without honoring his request to consult with a union representative, and by refusing to accept employee grievances. In addition, the Board's order noted that the company did not file exceptions to the ALJ's findings that it violated §§ 8(a)(1), (3), and (4) of the Act by issuing disciplinary warnings to two employees because they (among other things) assisted the union and were named in an unfair labor practice charge and by terminating one of these employees because he engaged in union activities and filed an unfair labor practice charge.
 
 
 7
 The Board's order requires RGC to cease and desist from engaging in the unfair labor practices and from interfering with, restraining, or coercing employees in the exercise of their § 7 rights. Specifically, the Board's order requires the company to offer the 46 strikers immediate reinstatement to their former jobs and to reimburse them for any lost earnings. In addition, the one discharged employee must be reinstated with back pay. RGC has filed a petition for review, challenging the NLRB's determinations regarding the swing shift assignments and the nature of the strike. The Board cross-petitions for enforcement of its order, noting that it is entitled to summary enforcement of those parts of the order that are based on the ALJ's unchallenged unfair labor practice findings. RGC does not object to summary enforcement as to matters that are truly uncontested, but it contends that it filed exceptions to two of the ALJ's findings that the Board characterizes as uncontested, specifically, that the company threatened retaliation for the vote and that it created an impression of surveillance.
 
 II.
 
 8
 Section 7 of the Act gives employees the right to "engage in ... concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. It is an unfair labor practice for an employer to "interfere with, restrain, or coerce employees in the exercise of" their § 7 rights, 29 U.S.C. § 158(a)(1), or to "discriminat[e] in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization," 29 U.S.C. § 158(a)(3). RGC argues that the NLRB erred (1) in finding that the shift assignments were in retaliation for protected activity, (2) in concluding that the collective bargaining agreement did not authorize shift assignments made in violation of the Act, and (3) in finding that the strike was motivated in part by retaliatory shift assignments. We review the Board's findings of fact only to determine whether they are supported by substantial evidence in the record as a whole. See Universal Camera Corp. v. NLRB, 340 U.S. 474, 487-88, 71 S.Ct. 456, 95 L.Ed. 456 (1951); NLRB v. CWI of Maryland, Inc., 127 F.3d 319, 326 (4th Cir.1997). In reviewing legal conclusions, we defer to the Board's interpretation of the Act "so long as its reading is a reasonable one." Holly Farms Corp. v. NLRB, 517 U.S. 392, 409, 116 S.Ct. 1396, 134 L.Ed.2d 593 (1996).
 
 A.
 
 9
 We first assess the NLRB's finding that RGC assigned certain mechanics to swing shifts in retaliation for concerted activity protected by § 7 of the Act. Because RGC's motive is relevant to the underlying unfair labor practice charge, the Board evaluated the evidence under its long-established standard from Wright Line, 251 N.L.R.B. 1083 (1980), enforced, 662 F.2d 899 (1st Cir.1981). To make out what Wright Line calls a prima facie case, the NLRB's General Counsel must show (1) that the employee was engaged in protected activity, (2) that the employer was aware of the activity, and (3) that the protected activity was a substantial or motivating factor for the employer's action. FPC Holdings, Inc. v. NLRB, 64 F.3d 935, 942 (4th Cir.1995) (citing Wright Line; NLRB v. Transp. Mgmt. Corp., 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983)). The Wright Line standard requires the General Counsel to "prove by a preponderance of the evidence that a discriminatory motive was a substantial or motivating factor" in the employer's action. CWI of Maryland, 127 F.3d at 331. If the General Counsel makes out a prima facie case, "[t]he burden then shifts to the employer to prove affirmatively that the same action would have been taken even in the absence of the employee's union activity." FPC Holdings, 64 F.3d at 942.
 
 
 10
 We turn to the General Counsel's prima facie case. Wright Line's first element is satisfied because RGC agrees that the vote at the union hall on the shift assignment proposal constituted protected activity. As to the second element, whether RGC was aware of the protected activity, RGC concedes that it knew that the employees took part in the vote on the shift assignment proposal. Nevertheless, RGC argues that because it did not know which employees had voted for the proposal and which had voted against, the NLRB cannot show that it punished any particular employee because of his vote. RGC cannot get off the hook so easily, for "the Board need not show that the employer knew of any particular employee's union involvement to show that the employer acted out of union animus." WXGI, Inc. v. NLRB, 243 F.3d 833, 843 (4th Cir.2001). Otherwise, an employer could retaliate against employees for all secret ballot votes and plead ignorance about the votes of specific employees. Adverse employment action in retaliation for concerted activity "violate[s] the NLRA, even if the employer wields an undiscerning axe, and anti-union employees suffer along with their pro-union counterparts." NLRB v. Frigid Storage, Inc., 934 F.2d 506, 510 (4th Cir.1991). Thus, the second element of Wright Line is satisfied because RGC knew that the employees voted and that some of them voted against the proposal.
 
 
 11
 To prove the third element, discriminatory motive, the General Counsel may rely on either direct or circumstantial evidence. FPC Holdings, 64 F.3d at 942. Here, circumstantial evidence was unnecessary because Short, RGC's maintenance supervisor, stated directly that the swing shift assignments were made because of the union vote. Likewise, Sloan, the general manager, called the mechanics "bloody bullies" who had "browbeat" the other employees into voting down the company's proposal. This constitutes direct evidence that the shift assignments were motivated by anti-union animus. See Alpo Petfoods, Inc. v. NLRB, 126 F.3d 246, 250, 252-53 (4th Cir.1997). The General Counsel therefore established a prima facie case. Once the General Counsel satisfies his burden, the Board is free to find a violation unless the employer can prove that it would have made the same decision absent the protected conduct. FPC Holdings, 64 F.3d at 942. This traditional statement of the employer's burden does not quite fit this case, for the protected conduct was the vote rejecting the proposal. Had the employees approved the proposal, RGC presumably would have implemented it. RGC made shift assignment choices only because the employees voted down the proposal. Thus, as applied to these facts, RGC's burden was to prove that it would have made the same shift assignments absent its retaliatory motivation.
 
 
 12
 Short testified that he made the assignment decisions by evaluating the relative talents of the mechanics. RGC argues that Short's angry statement in the meeting simply reflected his frustration that the union had voted down a proposal that he and others had worked hard to develop, not that the assignments were punishment or retaliation for the vote. However, Short's statement came in direct response to questions about the reason for the new assignments. Short responded, "I'll tell you ... why you're going on [the swing shifts, it's] because [of the] bullshit you went down there to the Union hall and started [and] the way you all voted." Testimony to this effect constitutes "relevant evidence [that] a reasonable mind might accept as adequate to support [the] conclusion" that the assignment decision was actually motivated by anti-union animus. Pirelli Cable Corp. v. NLRB, 141 F.3d 503, 514 (4th Cir.1998) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). Short's explicit statement at the meeting and Sloan's verbal attacks on the mechanics provide substantial evidence to support the Board's rejection of RGC's claim that the shift assignments were based on talent. FPC Holdings, 64 F.3d at 944. Moreover, even if Sloan made the specific assignments on the basis of talent, the assignments still constitute an unfair labor practice because Short's and Sloan's statements show that the basic decision to assign the swing shifts to eight front shop mechanics without regard to seniority was motivated by anti-union animus. In all events, substantial evidence supports the Board's finding that the shift assignment decision was actually in retaliation for the vote against the company's proposal.
 
 B.
 
 13
 RGC also attempts to assert a contractual defense to the charge of retaliatory shift assignments. The company argues that its decision to unilaterally assign the front shop mechanics to swing shifts without regard to seniority, and without acquiring union consent, was within its discretion under the collective bargaining agreement. There is a dispute as to whether RGC retained this power under the agreement, but we will assume for the sake of argument that it did. RGC argues that because it was acting within its discretion under the collective bargaining agreement, its motives are irrelevant and its actions cannot violate the NLRA. The Board, in line with longstanding precedent, rejected this argument, explaining that the contract does not authorize "attempts to assign employees to more onerous shifts against their will ... where the employer has ... made [the assignments] because of the employees' union activities." RGC (USA) Mineral Sands, Inc., 332 N.L.R.B. No. 172, 2001 WL 44225, *7 (Jan. 10, 2001). See also Reno Hilton Resorts, 326 N.L.R.B. 1421, 1430, 1998 WL 723981 (1998), enforced, 196 F.3d 1275 (D.C.Cir.1999). We agree with the Board that an employer cannot exercise contractual rights to punish employees for protected activity. See Reno Hilton Resorts v. NLRB, 196 F.3d 1275, 1281 (D.C.Cir.1999) (noting "the general principle that a party cannot exercise its contractual rights in violation of the law"); Capitol Steel & Iron Co. v. NLRB, 89 F.3d 692, 697 (10th Cir.1996) ("The provision in question here entitled the Company to implement raises unilaterally during the term of the contract. However, when the Company undermined the union's role as the employees' sole bargaining agent by raising wages in a manner engineered to influence employees to vote in its favor at a key moment in the bargaining process, it improperly exploited that waiver and violated §§ 8(a)(5) and (1) of the NLRA."); NLRB v. Joy Techs., Inc., 990 F.2d 104, 110-11 n. 7 (3d Cir.1993) ("[E]ven if the contract provision gives the Employer the discretion to transfer positions under other circumstances, contract language does not exempt the Employer from its obligation to act lawfully under the NLRA.").
 
 
 14
 RGC urges us to adopt the rule articulated by the Sixth Circuit in "Automatic" Sprinkler Corp. of America v. NLRB, 120 F.3d 612, 620 (6th Cir.1997), which held that if an employer's action is within its powers under the terms of the collective bargaining agreement, anti-union motivation is irrelevant and does not turn the action into an unfair labor practice. A strong dissent in Automatic Sprinkler argued that "[t]he [company's] otherwise neutral act of subcontracting, as permitted by the collective bargaining agreement, became an unfair labor practice, because it was ... motivated, primarily, by anti-union animus." Id. at 622. The rule stated by the majority in Automatic Sprinkler has not been cited with approval outside the Sixth Circuit. See Reno Hilton, 196 F.3d at 1281. We believe that the Automatic Sprinkler rule has not caught on for good reason.
 
 
 15
 The principle that otherwise lawful acts can be rendered unlawful when motivated by improper intentions is widely accepted and appears repeatedly throughout the law. For example, the otherwise legal act of giving a gift to a public official only becomes bribery when the giver intends for the gift to influence a decision. See 18 U.S.C. § 201 (2001). Likewise, otherwise legal adverse employment action is rendered illegal when motivated by race, color, religion, sex, or national origin. See 42 U.S.C. § 2000e et seq. (2001); Spriggs v. Diamond Auto Glass, 165 F.3d 1015, 1020 (4th Cir.1999). Even assuming that RGC was within its rights under the collective bargaining agreement to unilaterally impose shift assignments, RGC cannot act with the intent to punish or discourage protected concerted activity. To hold otherwise would be to eviscerate both the rights found in § 7 of the Act and the protection afforded the exercise of those rights by §§ 8(a)(1) and (3). An employer could retaliate against workers for protected activity so long as the employer retaliated by acting within its powers under the collective bargaining agreement. This would be contrary to the clear language of §§ 8(a)(1) and (3), which prohibits any form of retaliation for protected § 7 activities. We therefore reject the Automatic Sprinkler rule and adhere to the "general principle that a party cannot exercise its contractual rights in violation of the [NLRA]." Reno Hilton Resorts, 196 F.3d at 1281.
 
 C.
 
 16
 RGC argues that even if the shift assignments amounted to an unfair labor practice, the assignments were not a motivating factor for the strike, which occurred ten months later. Accordingly, RGC says that the strike was an economic strike, not an unfair labor practice strike. A strike is classified as an unfair labor practice strike if it is "initiated in whole or in part in response to unfair labor practices committed by the employer." Pirelli Cable, 141 F.3d at 515 (emphasis added) (quotations omitted). Significant consequences attach to an unfair labor practice strike: "[u]nfair labor practice strikers are entitled to immediate reinstatement upon their unconditional offer to return to work, or if reinstatement is a result of litigation, reinstatement with back pay." Id.
 
 
 17
 The NLRB points out that seniority in shift assignments was a major issue throughout the contract negotiations. Indeed, union leaders stated publicly that the strike was in protest of the company's refusal to consider seniority in employment decisions. RGC concedes that seniority in shift assignments was an issue in contract negotiations. But RGC argues that although the strike may have been motivated in part by the employees' desire for a seniority-based shift assignment clause in the contract, there was insufficient evidence to establish that the strike was initiated to protest RGC's past retaliatory assignment practices. As RGC appears to concede, there is substantial evidence that the strikers were motivated by a desire for a contract clause that would require the company to consider seniority in making shift assignments. More importantly, there is also substantial evidence that the desire for such a clause was triggered, at least in part, by fears created by RGC's prior retaliatory assignment of the eight front shop mechanics to swing shifts without considering their seniority. According to a union negotiator, one of the union's proposals in the contract negotiations was aimed at preventing "[t]he discrimination based on the shift assignments which had occurred in the latter part of '97 [and] ... which ultimately led to the Board charges." And, as one employee contemplating the strike put it, "if they'll do the senior mechanics the way they have, they will do anybody that way." On this evidence the Board did not err in finding that the unlawful shift assignments were one of the causes of the strike. The strike was therefore an unfair labor practice strike, and RGC violated §§ 8(a)(1) and (3) of the Act by refusing to reinstate the strikers when they made an unconditional offer to return to work.
 
 D.
 
 18
 We conclude that substantial evidence supports the NLRB's finding that the shift assignments constituted retaliation and punishment for the employees' exercise of their protected § 7 rights. The collective bargaining agreement did not allow RGC to make retaliatory shift assignments because an employer cannot exercise its contract rights in violation of the NLRA. Substantial evidence also supports the Board's finding that the retaliatory shift assignments were a motivating factor in the subsequent strike. Accordingly, we will enforce the NLRB's order awarding reinstatement and back pay to the strikers and requiring RGC to cease and desist from certain unlawful conduct in the future.
 
 III.
 
 19
 The NLRB seeks summary enforcement of those parts of its order that would remedy violations based on unfair labor practice findings of the ALJ that were not objected to by RGC. A number of the violations found by the ALJ are uncontested, and the Board is entitled to summary enforcement of its order as it relates to those violations. Frigid Storage, 934 F.2d at 509. Nevertheless, RGC opposes summary enforcement on two violations that it says it contested before the Board. Specifically, the company asserts that it filed exceptions to the ALJ's findings that it violated §§ 8(a)(1) and (3) when Short threatened the mechanics with onerous shift assignments and when Sloan created the impression of company surveillance of the employees' union activities. See RGC (USA) Mineral Sands, Inc., 332 N.L.R.B. No. 172, 2001 WL 44225, *23-24 (Jan. 10, 2001) (NLRB order, pars. 1(a) and 1(f)). At oral argument the Board acknowledged that RGC had filed an exception to the ALJ's finding of the threat. In addition, RGC's exceptions clearly include a reference to the ALJ's finding that Sloan had created an impression of surveillance. Accordingly, the NLRB is not entitled to summary enforcement of those parts of its order that rely on these findings. Even so, we will enforce those parts of the order if the underlying findings are supported by substantial evidence. Just as Short's statement that the new shift assignments were made because of the bullshit at the union hall and the vote provides substantial evidence that the assignments were in retaliation for union activity, that same statement may reasonably be interpreted as a threat of retaliation. In addition, Sloan's statement that the mechanics were bloody bullies who had browbeaten the other employees into rejecting the shift assignment proposal constitutes substantial evidence that RGC created an impression that it was monitoring the mechanics' union activities with respect to the vote. Thus, these findings support enforcement of the parts of the Board's order that require the company to refrain from threats of retaliation and from creating an impression of surveillance of union activities.
 
 IV.
 
 20
 For the foregoing reasons, we deny RGC's petition for review, and we grant the Board's cross-petition for enforcement of its order.
 
 
 21
 No. 01-1174 — PETITION DENIED.
 
 
 22
 No. 01-1371 — CROSS-PETITION GRANTED AND ORDER ENFORCED.